GARNER, FORMER CHAIRMAN OF THE STATE
BOARD OF PARDONS AND PAROLES OF
GEORGIA, ET AL. *v.* JONES

No. 99–137.   Argued January 11, 2000—Decided March 28, 2000

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, THOMAS, and BREYER, JJ., joined. SCALIA, J., filed an opinion concurring in part in the judgment, *post*, p. 257. SOUTER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined, *post*, p. 260.

*Christopher S. Brasher*, Senior Assistant Attorney General of Georgia, argued the cause for petitioners. With him on the briefs were *Thurbert E. Baker*, Attorney General, *Mary Beth Westmoreland*, Deputy Attorney General, and *Jacqueline F. Bunn*, Assistant Attorney General.

*Elizabeth Thompson Kertscher* argued the cause for respondent. With her on the brief were *William V. Custer* and *LeeAnn Jones.**

JUSTICE KENNEDY delivered the opinion of the Court.

We granted certiorari to decide whether the retroactive application of a Georgia law permitting the extension of intervals between parole considerations violates the *Ex Post Facto* Clause. The Court of Appeals found that retroactive application of the change in the law was necessarily an *ex post facto* violation. In disagreement with that determination, we reverse its judgment and remand for further proceedings.

---

**Jill A. Pryor, Steven R. Shapiro*, and *Gerald Weber* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

## I

In 1974 respondent Robert L. Jones began serving a life sentence after his conviction for murder in the State of Georgia. He escaped from prison some five years later and, after being a fugitive for over two years, committed another murder. He was apprehended, convicted, and in 1982 sentenced to a second life term.

Under Georgia law, at all times relevant here, the State's Board of Pardons and Paroles (Board or Parole Board) has been required to consider inmates serving life sentences for parole after seven years. Ga. Code Ann. § 42–9–45(b) (1982). The issue in this case concerns the interval between proceedings to reconsider those inmates for parole after its initial denial. At the time respondent committed his second offense, the Board's Rules required reconsiderations to take place every three years. Ga. Rules & Regs., Rule 475–3–.05(2) (1979). In 1985, after respondent had begun serving his second life sentence, the Parole Board, acting under its authority to "set forth . . . the times at which periodic reconsideration [for parole] shall take place," Ga. Code Ann. § 42–9–45(a) (1982), amended its Rules to provide that "[r]econsideration of those inmates serving life sentences who have been denied parole shall take place at least every eight years," Ga. Rules & Regs., Rule 475–3–.05(2) (1985).

The Parole Board considered respondent for parole in 1989, seven years after the 1982 conviction. It denied release and, consistent with the 1985 amendment to Rule 475–3–.05(2), reconsideration was set for 1997, eight years later. In 1991, however, the United States Court of Appeals for the Eleventh Circuit held that retroactive application of the amended Rule violated the *Ex Post Facto* Clause. *Akins* v. *Snow*, 922 F. 2d 1558, cert. denied, 501 U. S. 1260 (1991). In compliance with that decision, in effect reinstating its earlier 3-year Rule, the Parole Board reconsidered respondent's case in 1992 and in 1995. Both times parole was denied, the Board citing for its action respondent's "multiple offenses"

and the "circumstances and nature of" the second offense. App. 53–54.

In 1995 the Parole Board determined that our decision in *California Dept. of Corrections* v. *Morales,* 514 U. S. 499 (1995), had rejected the rationale underlying the Eleventh Circuit's decision in *Akins.* The Board resumed scheduling parole reconsiderations at least every eight years, and so at respondent's 1995 review it set the next consideration for 2003. Had the Board wished to do so, it could have shortened the interval, but the 8-year period was selected based on respondent's "multiple offenses" and the "circumstances and nature of" his second offense. App. 54. Respondent, acting *pro se,* brought this action under Rev. Stat. § 1979, 42 U. S. C. § 1983, claiming, *inter alia,* the amendment to Rule 475–3–.05(2) violated the *Ex Post Facto* Clause. The suit was filed against individual members of the Parole Board, petitioners in this Court. Respondent requested leave to conduct discovery to support his claim, but the District Court denied the motion and entered summary judgment for petitioners. The court determined the amendment to Rule 475–3–.05(2) "change[d] only the timing between reconsideration hearings" for inmates sentenced to life in prison, thereby "relieving the Board of the necessity of holding parole hearings for prisoners who have no reasonable chance of being released." App. to Pet. for Cert. 27a. Because the Parole Board's policies permit inmates, upon a showing of "a change in their circumstance or where the Board receives new information," App. 56, to receive expedited reconsideration for parole, the court further concluded the amendment created " 'only the most speculative and attenuated possibility' " of increasing a prisoner's measure of punishment, App. to Pet. for Cert. 27a (quoting *Morales, supra,* at 509).

The Court of Appeals reversed, finding the amended Georgia Rule distinguishable in material respects from the California law sustained in *Morales.* 164 F. 3d 589 (CA11 1999). In finding the Georgia law violative of the *Ex Post Facto*

Clause, the court posited that the set of inmates affected by the retroactive change—all prisoners serving life sentences—is "bound to be far more sizeable than the set . . . at issue in *Morales*"—inmates convicted of more than one homicide. *Id.*, at 594. The Georgia law sweeps within its coverage, the court continued, "many inmates who can expect at some point to be paroled," *ibid.*, and thus "seems certain to ensure that some number of inmates will find the length of their incarceration extended in violation of the *Ex Post Facto* Clause of the Constitution," *id.*, at 595. "Eight years is a long time," the court emphasized, and "[m]uch can happen in the course of eight years to affect the determination that an inmate would be suitable for parole." *Ibid.* The Court of Appeals recognized that the Parole Board would set a new parole review date three years or more into the future (up to eight years) only where it concludes that " 'it is not reasonable to expect that parole would be granted'" sooner. *Ibid.* (quoting policy statement of Parole Board). The court thought this policy insufficient, however, because, unlike the statute in *Morales*, it does not require the Board "to make any particularized findings" and is not "carefully tailored." 164 F. 3d, at 594–595. The court also recognized that the Board's policy permitted it to reconsider any parole denials upon a showing of a "change in circumstance[s]" or upon the Board's receipt of "new information." The court deemed the policy insufficient, however, stating that "[p]olicy statements, unlike regulations are unenforceable and easily changed, and adherence to them is a matter of the Board's discretion." *Id.*, at 595.

We granted certiorari, 527 U. S. 1068 (1999), and we now reverse.

## II

The States are prohibited from enacting an *ex post facto* law. U. S. Const., Art. I, § 10, cl. 1. One function of the *Ex Post Facto* Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its com-

mission. *Collins* v. *Youngblood*, 497 U. S. 37, 42 (1990) (citing *Beazell* v. *Ohio*, 269 U. S. 167, 169–170 (1925)). Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept. See *Lynce* v. *Mathis*, 519 U. S. 433, 445–446 (1997) (citing *Weaver* v. *Graham*, 450 U. S. 24, 32 (1981)); *Morales*, 514 U. S., at 508–509. Whether retroactive application of a particular change in parole law respects the prohibition on *ex post facto* legislation is often a question of particular difficulty when the discretion vested in a parole board is taken into account.

Our recent decision in *Morales* is an appropriate beginning point. There a California statute changed the frequency of reconsideration for parole from every year to up to every three years for prisoners convicted of more than one homicide. *Id.*, at 503. We found no *ex post facto* violation, emphasizing that not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited. *Id.*, at 508–509. The question is "a matter of 'degree.'" *Id.*, at 509 (quoting *Beazell, supra*, at 171). The controlling inquiry, we determined, was whether retroactive application of the change in California law created "a sufficient risk of increasing the measure of punishment attached to the covered crimes." 514 U. S., at 509.

The amended California law did not violate this standard. It did not modify the statutory punishment imposed for any particular offenses. Nor did the amendment alter the standards for determining either the initial date for parole eligibility or an inmate's suitability for parole. *Id.*, at 507. The amendment did not change the basic structure of California's parole law. It vested the California parole board with discretion to decrease the frequency with which it reconsidered parole for a limited class, consisting of prisoners convicted of more than one homicide. *Id.*, at 507, 510. If the board determined a low likelihood of release existed for a member within that class, it could set the prisoner's next consider-

ation date three years hence. The change in California law did not, however, prohibit requests for earlier reconsideration based on a change of circumstances. *Id.*, at 512–513. Historical practices within the California penal system indicated "about 90% of *all* prisoners are found unsuitable for parole at the initial hearing, while 85% are found unsuitable at the second and subsequent hearings." *Id.*, at 510–511 (citing *In re Jackson,* 39 Cal. 3d 464, 473, 703 P. 2d 100, 105 (1985)). On these facts we determined the *Ex Post Facto* Clause did not prohibit California from conserving and reallocating the resources that would otherwise be expended to conduct annual parole hearings for inmates with little chance of release. 514 U. S., at 511–512. The sum of these factors illustrated that the decrease in the frequency of parole suitability proceedings "create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes." *Id.*, at 509.

Consistent with the Court of Appeals' analysis, respondent stresses certain differences between Georgia's amended parole law and the California statute reviewed in *Morales.* The amendment to Rule 475–3–.05(2), respondent urges, permits the extension of parole reconsiderations by five years (not just by two years); covers all prisoners serving life sentences (not just multiple murderers); and affords inmates fewer procedural safeguards (in particular, no formal hearings in which counsel can be present). These differences are not dispositive. The question is whether the amended Georgia Rule creates a significant risk of prolonging respondent's incarceration. See *ibid.* The requisite risk is not inherent in the framework of amended Rule 475–3–.05(2), and it has not otherwise been demonstrated on the record.

Our decision in *Morales* did not suggest all States must model their procedures governing consideration for parole after those of California to avoid offending the *Ex Post Facto* Clause. The analysis undertaken in *Morales* did identify

factors which convinced us the amendment to California law created an insignificant risk of increased punishment for covered inmates. Our opinion was careful, however, not to adopt a single formula for identifying which legislative adjustments, in matters bearing on parole, would survive an *ex post facto* challenge. *Ibid.* We also observed that the *Ex Post Facto* Clause should not be employed for "the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures." *Id.*, at 508. These remain important concerns. The States must have due flexibility in formulating parole procedures and addressing problems associated with confinement and release.

The case turns on the operation of the amendment to Rule 475–3–.05(2) within the whole context of Georgia's parole system. Georgia law charges the Parole Board with determining which prisoners "may be released on pardon or parole and [with] fixing the time and conditions thereof." Ga. Code Ann. § 42–9–20 (1997). In making release decisions, the same law, in relevant part, provides:

> "Good conduct, achievement of a fifth-grade level or higher on standardized reading tests, and efficient performance of duties by an inmate shall be considered by the board in his favor and shall merit consideration of an application for pardon or parole. No inmate shall be placed on parole until and unless the board shall find that there is reasonable probability that, if he is so released, he will live and conduct himself as a respectable and law-abiding person and that his release will be compatible with his own welfare and the welfare of society. Furthermore, no person shall be released on pardon or placed on parole unless and until the board is satisfied that he will be suitably employed in self-sustaining employment or that he will not become a public charge." § 42–9–42(c).

See also § 42–9–43 (listing information the Board should consider, including wardens' reports, results of physical and mental examinations, and reports regarding prisoners' performance in educational programs). These provisions illustrate the broad discretion the Parole Board possesses in determining whether an inmate should receive early release. Accord, *Sultenfuss* v. *Snow*, 35 F. 3d 1494, 1501–1502 (CA11 1994) (en banc) (describing the discretion Georgia law vests with Parole Board). Only upon a showing that the Board engaged in a "gross abuse of discretion" can a prisoner challenge a parole denial in the Georgia courts. *Lewis* v. *Griffin*, 258 Ga. 887, 888, n. 3, 376 S. E. 2d 364, 366, n. 3 (1989).

The presence of discretion does not displace the protections of the *Ex Post Facto* Clause, however. Cf. *Weaver*, 450 U. S., at 30–31. The danger that legislatures might disfavor certain persons after the fact is present even in the parole context, and the Court has stated that the *Ex Post Facto* Clause guards against such abuse. See *Miller* v. *Florida*, 482 U. S. 423, 429 (1987) (citing *Calder* v. *Bull*, 3 Dall. 386, 389 (1798) (Chase, J.)). On the other hand, to the extent there inheres in *ex post facto* doctrine some idea of actual or constructive notice to the criminal before commission of the offense of the penalty for the transgression, see *Weaver*, *supra*, at 28–29, we can say with some assurance that where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions. See, *e. g.*, *Justice* v. *State Board of Pardons and Paroles*, 234 Ga. 749, 751–752, 218 S. E. 2d 45, 46–47 (1975) (explaining, by illustration to one prisoner's circumstances, that parole decisions rest upon the

Board's consideration of numerous factors specific to an inmate's offense, rehabilitative efforts, and ability to live a responsible, productive life). The essence of respondent's case, as we see it, is not that discretion has been changed in its exercise but that, in the period between parole reviews, it will not be exercised at all. The statutory structure, its implementing regulations, and the Parole Board's unrefuted representations regarding its operations do not lead to this conclusion.

The law changing the frequency of parole reviews is qualified in two important respects. First, the law vests the Parole Board with discretion as to how often to set an inmate's date for reconsideration, with eight years for the maximum. See Ga. Rules & Regs., Rule 475–3–.05(2) (1985) ("Reconsideration . . . shall take place at least every eight years"). Second, the Board's policies permit "expedited parole reviews in the event of a change in their circumstance or where the Board receives new information that would warrant a sooner review." App. 56. These qualifications permit a more careful and accurate exercise of the discretion the Board has had from the outset. Rather than being required to review cases *pro forma*, the Board may set reconsideration dates according to the likelihood that a review will result in meaningful considerations as to whether an inmate is suitable for release. The Board's stated policy is to provide for reconsideration at 8-year intervals "when, in the Board's determination, it is not reasonable to expect that parole would be granted during the intervening years." *Ibid.* The policy enables the Board to put its resources to better use, to ensure that those prisoners who should receive parole come to its attention. By concentrating its efforts on those cases identified as having a good possibility of early release, the Board's Rules might result in the release of some prisoners earlier than would have been the case otherwise.

The particular case of respondent well illustrates that the Board's Rule changes are designed for the better exercise of

the discretion it had from the outset. Given respondent's criminal history, including his escape from prison and the commission of a second murder, it is difficult to see how the Board increased the risk of his serving a longer time when it decided that its parole review should be exercised after an 8-year, not a 3-year, interval. Yet if such a risk develops, respondent may, upon a showing of either "a change in [his] circumstance[s]" or the Board's receipt of "new information," seek an earlier review before the 8-year interval runs its course.

We do not accept the Court of Appeals' supposition that Rule 475–3–.05(2) "seems certain" to result in some prisoners serving extended periods of incarceration. 164 F. 3d, at 595. The standard announced in *Morales* requires a more rigorous analysis of the level of risk created by the change in law. Cf. 514 U. S., at 506–507, n. 3 ("After *Collins,* the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage' . . . but on whether any such change . . . increases the penalty by which a crime is punishable"). When the rule does not by its own terms show a significant risk, the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule. The litigation in *Morales* concerned a statute covering inmates convicted of more than one homicide and proceeded on the assumption that there were no relevant differences between inmates for purposes of discerning whether retroactive application of the amended California law violated the *Ex Post Facto* Clause. In the case before us, respondent must show that as applied to his own sentence the law created a significant risk of increasing his punishment. This remains the issue in the case, though the general operation of the Georgia parole system may produce relevant evidence and inform further analysis on the point.

The record before the Court of Appeals contained little information bearing on the level of risk created by the change in law. Without knowledge of whether retroactive application of the amendment to Rule 475-3-.05(2) increases, to a significant degree, the likelihood or probability of prolonging respondent's incarceration, his claim rests upon speculation.

On the record in this case, we cannot conclude the change in Georgia law lengthened respondent's time of actual imprisonment. Georgia law vests broad discretion with the Board, and our analysis rests upon the premise that the Board exercises its discretion in accordance with its assessment of each inmate's likelihood of release between reconsideration dates. If the assessment later turns out not to hold true for particular inmates, they may invoke the policy the Parole Board has adopted to permit expedited consideration in the event of a change in circumstances. App. 56.

The Court of Appeals erred in not considering the Board's internal policy statement. At a minimum, policy statements, along with the Board's actual practices, provide important instruction as to how the Board interprets its enabling statute and regulations, and therefore whether, as a matter of fact, the amendment to Rule 475-3-.05(2) created a significant risk of increased punishment. It is often the case that an agency's policies and practices will indicate the manner in which it is exercising its discretion. Cf. *INS* v. *Yueh-Shaio Yang*, 519 U. S. 26, 32 (1996) (observing that the reasonableness of discretionary agency action can be gauged by reference to the agency's policies and practices). The Court of Appeals was incorrect to say the Board's policies were of no relevance in this case. Absent a demonstration to the contrary, we presume the Board follows its statutory commands and internal policies in fulfilling its obligations. Cf. *United States ex rel. Accardi* v. *Shaugnessy*, 347 U. S. 260, 266-268 (1954). In *Morales*, we relied upon the State's representation that its parole board had a practice of grant-

ing inmates' requests for early review. See 514 U. S., at 512–513 (citing Reply Brief for Petitioner, O. T. 1994, No. 93–1462, p. 3, n. 1). The policy statement here, by contrast, is a formal, published statement as to how the Board intends to enforce its Rule. It follows *a fortiori* from *Morales* that the Court of Appeals should not have disregarded the policy. Absent any demonstration to the contrary from respondent, we respect the Board's representation that inmates, upon making a showing of a "change in their circumstance[s]" or upon the Board's receipt of "new information," may request expedited consideration. App. 56.

The Court of Appeals' analysis failed to reveal whether the amendment to Rule 475–3–.05(2), in its operation, created a significant risk of increased punishment for respondent. Respondent claims he has not been permitted sufficient discovery to make this showing. The matter of adequate discovery is one for the Court of Appeals or, as need be, for the District Court in the first instance. The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in part in the judgment.

I would agree with the Court's opinion if we were faced with an amendment to the frequency of parole-eligibility determinations prescribed by the Georgia Legislature. Since I do not believe, however, that a change in frequency prescribed by the Georgia State Board of Pardons and Paroles (Board) would violate the *Ex Post Facto* Clause even if it did pose a sufficient "risk" of decreasing the likelihood of parole, I would reverse the decision of the Eleventh Circuit without the necessity of remand.

The Court treats this case as a mere variation on the *Morales* theme, whereas in reality it contains a critical difference: In *Morales*, the frequency of parole suitability hearings had been fixed by law, and a legislative change had given

California's Board of Prison Terms discretion to decrease the frequency. See *California Dept. of Corrections* v. *Morales*, 514 U. S. 499, 503 (1995); *ante*, at 250. Here, there has been no such change. Today, as at the time of respondent's offense, the Georgia statute requires only that the Board provide for automatic "periodic reconsideration," Ga. Code Ann. § 42–9–45 (1982). The length of the period, like the ultimate question of parole, was and is entrusted to the Board's discretion.

Any sensible application of the *Ex Post Facto* Clause, and any application faithful to its historical meaning, must draw a distinction between the penalty that a person can anticipate for the commission of a particular crime, and opportunities for mercy or clemency that may go to the reduction of the penalty. I know of no precedent for the proposition that a defendant is entitled to the same degree of mercy or clemency that he could have expected at the time he committed his offense. Under the traditional system of minimum-maximum sentences (20 years to life, for example), it would be absurd to argue that a defendant would have an *ex post facto* claim if the compassionate judge who presided over the district where he committed his crime were replaced, prior to the defendant's trial, by a so-called "hanging judge." Discretion to be compassionate or harsh is inherent in the sentencing scheme, and being denied compassion is one of the risks that the offender knowingly assumes.

At the margins, to be sure, it may be difficult to distinguish between justice and mercy. A statutory parole system that reduces a prisoner's sentence by fixed amounts of time for good behavior during incarceration can realistically be viewed as an entitlement—a reduction of the prescribed penalty—rather than a discretionary grant of leniency. But that is immeasurably far removed from the present case. In Georgia parole, like pardon (which is granted or denied by the same Board), is—and was at the time respondent committed his offense—a matter of grace. It may be denied for

any reason (except, of course, an unlawful one such as race), or for no reason. And where, as here, the length of the reconsideration period is entrusted *to the discretion of the same body that has discretion over the ultimate parole determination,* any risk engendered by changes to the length of that period is merely part of the uncertainty which was inherent in the discretionary parole system, and to which respondent subjected himself when he committed his crime.

It makes no more sense to freeze in time the Board's discretion as to procedures than it does to freeze in time the Board's discretion as to substance. Just as the *Ex Post Facto* Clause gives respondent no cause to complain that the Board in place at the time of his offense has been replaced by a new, tough-on-crime Board that is much more parsimonious with parole, it gives him no cause to complain that it has been replaced by a new, big-on-efficiency Board that cuts back on reconsiderations without cause. And the change in policy is irrelevant, in my view, whether or not the pre-existing policy happens to have been embodied in a policy statement or regulation. To make the constitutional prohibition turn upon that feature would be to ignore reality and to discourage measures that promote fairness and consistency. Such a policy statement or regulation, in the context of a system conferring complete discretion as to substance and as to the timing of hearings upon the Board, simply creates no reasonable expectation of entitlement, except perhaps among prisoners whose parole hearings are held (or are scheduled to be held) while the regulation is in effect. This is not an expectation of the sort that can give rise to *ex post facto* concerns.

In essence, respondent complains that by *exercising* its discretion (as to the frequency of review), the Board has *deprived* him of the exercise of its discretion (as to the question of his release). In my view, these are two sides of the same coin—two aspects of one and the same discretion—and respondent can have no valid grievance.

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, dissenting.

I think the Court of Appeals made no error here and so respectfully dissent from the reversal. A change in parole policy violates the *Ex Post Facto* Clause if it creates a "sufficient," *California Dept. of Corrections* v. *Morales*, 514 U. S. 499, 509 (1995), or substantial risk that the class affected by the change will serve longer sentences as a result.[1] To determine the likelihood that the change at issue here will lengthen sentences, we need to look at the terms of the new Rule, and then at the possibility that the terms are mitigated by a practice of making exceptions.

Before the board changed its reconsideration Rule, a prisoner would receive a second consideration for parole by year 10, whereas now the second consideration must occur only by year 15; those who would receive a third consideration at year 13 will now have no certain consideration until year 23, and so on. An example of the effect of the longer intervals between mandatory review can be seen by considering the average term served under the old Rule. In 1992, a member of the Georgia Legislature stated that the average life-sentenced inmate served 12 years before parole. See Spotts, Sentence and Punishment: Provide for the Imposition of Life Sentence Without Parole, 10 Ga. St. U. L. Rev. 183, 183, and n. 4 (1993). Some prisoners must have been pa-

---

[1] In the first instance, at least, our cases have traditionally evaluated the effect of the change on the class subject to the new rule, rather than focusing solely on the individual challenging the change, *Weaver* v. *Graham*, 450 U. S. 24, 33 (1981). It can be difficult, if not impossible, for one person to prove that a change in penal policy has increased the quantum of punishment beyond what he would previously have received, since a sentencing decision is often a mix of rules and discretion. See *Lindsey* v. *Washington*, 301 U. S. 397, 401 (1937). At the same time, when one looks at the affected class it can be quite clear that punishment has increased overall. That is proof enough that the new Rule applied retroactively violates the *Ex Post Facto* Clause and, as an invalid rule, should not be applied to anyone within the class.

roled before 12 years. But those who would have been paroled when considered a second time at year 10 or a third time at year 13 will now be delayed to year 15. While the average helps to show the effects Georgia's new Rule is likely to have on some prisoners who would be released at the early end of the parole spectrum, the changed Rule threatens to increase punishment for all life-sentenced prisoners, not just those who would have been paroled at or before the average time. If a prisoner who would have been paroled on his fourth consideration in year 16 under the old Rule has to wait until his third consideration in year 23 under the new Rule, his punishment has been increased regardless of the average.

Georgia, which controls all of the relevant information, has given us nothing to suggest the contrary. It has given us no basis to isolate any subclass of life prisoners subject to the change who were unlikely to be paroled before some review date at which consideration is guaranteed under the new Rule. On the contrary, the terms of the Rule adopted by the State define the affected class as the entire class of life-sentenced prisoners, and the natural inference is that the Rule affects prisoners throughout the whole class. This is very different from the situation in *Morales*, in which it was shown that 85% of the affected class were found unsuited for parole upon reconsideration. *Morales, supra,* at 511. At some point, common sense can lead to an inference of a substantial risk of increased punishment, and it does so here.

The significance of that conclusion is buttressed by statements by the board and its chairman, available at the board's official website, indicating that its policies were intended to increase time served in prison. See Georgia State Board of Pardons and Paroles, News Releases, Policy Mandates 90% Prison Time for Certain Offenses (Jan. 2, 1998), http://www.pap.state.ga.us/pr__98.html ("Since 1991 the Board has steadily and consistently amended and refined its guidelines and policies to provide for lengthier prison service for

violent criminals"); Georgia State Board of Pardons and Paroles, Violent-Crime Lifers Who Died in Prison (June 4, 1998), http://www.pap.state.ga.us/pr__98.html (quoting Chairman Walter Ray as stating that "'obtaining parole on a life-sentence is increasingly rare'" and reporting that "[b]ecause of strict sentencing laws as well as the Board's conservative paroling policy, agency officials predict successive fiscal years will reflect a rising number of inmates for whom a life sentence does indeed mean just that").[2]  If respondent had ever been allowed to undertake discovery, further statements of punitive intent may well have been forthcoming.  Although we have never decided that a purpose to increase punishment, absent a punitive effect, itself invalidates a retroactive policy change, see Lynce v. Mathis, 519 U. S. 433, 443 (1997), evidence of purpose certainly confirms the inference of substantial risk of longer sentences drawn above.  It is, after all, reasonable to expect that members of a parole board acting with a purpose to get tough succeed in doing just that.

On the other side, there is no indication that the board adopted the new policy merely to obviate useless hearings or save administrative resources, the justification the Court accepted in Morales.  See 514 U. S., at 511.  Indeed, since a parole board review in Georgia means that one board member examines an inmate's file without a hearing and makes a decision, and no specific findings are required to deny parole, any interpretation of the rule change as a measure to conserve resources is weak at best, and insufficient to counter the inference of a substantial risk that the prisoners who will get subsequent mandatory parole considerations years after

---

[2] As Georgia's punitiveness increased, the number of persons on parole decreased.  See Georgia State Board of Pardons and Paroles, Georgia's Criminal Justice Population Increased by 9% in 1998; Only Decrease Was in Persons on Parole (Feb. 1, 1999), http://www.pap.state.ga.us/pr__99.html.  News releases available in Clerk of Court's case file.

the reviews that the old Rule would have guaranteed will in fact serve longer sentences.[3]

Thus, I believe the Eleventh Circuit properly granted summary judgment for respondent. Although Georgia argues that the board freely makes exceptions to the 8-year Rule in appropriate cases, the State provided no evidence that the board's occasional willingness to reexamine cases sufficiently mitigates the substantial probability of increased punishment. While the majority accepts the argument that, even without evidence of practice, the board's discretion to revisit its assignment of a reconsideration date may be suffi-

---

[3] The majority suggests, *ante*, at 252, that the Court required no particular procedural safeguards in *California Dept. of Corrections* v. *Morales,* even though the Court mentioned those safeguards as an important factor in its conclusion that there was no increase in the quantum of punishment in that case, see 514 U. S., at 511–512. This is true, but it does not address the problem with Georgia's virtually unbounded scheme. Once the risk of increased punishment exists, the board's nearly nonexistent safeguards provide no way of reducing that risk.

Georgia insists that its lack of procedural safeguards is irrelevant to this case, because due process does not require much in the way of procedural safeguards for parole. But that is beside the point. The challenge here is to the retroactive increase in the quantum of punishment. Unlike the California procedure for delaying parole reconsideration in *Morales,* the Georgia procedure here includes no actual hearing for the prisoner whose reconsideration is delayed five extra years, and the board is not required to explain itself. Georgia's procedural minimalism increases the likelihood that prisoners will get rubberstamp treatment, and decreases the likelihood that the exceptions to the policy on which the majority relies will actually be applied in a way that diminishes the significant probability of increased punishment. Cf. *Penson* v. *Ohio,* 488 U. S. 75, 81–82, n. 4 (1988) (stating that a requirement to give written reasons provides an inducement to make careful decisions in cases that might otherwise be summarily ignored); *Smith* v. *Robbins,* 528 U. S. 259, 290–291 (2000) (STEVENS, J., dissenting) (noting that the process of writing out reasons for decision improves the quality of the decision and can reveal error). Parole need not operate under rigidly defined procedures, but if the board decides to make changes retroactive, it must do something to prevent those changes from increasing punishment in violation of the *Ex Post Facto* Clause.

cient standing alone to preclude an *ex post facto* challenge, this is surely wrong. The policy statement on which the majority is willing to rely, see App. 56, gives a prisoner no assurance that new information or changed circumstances will matter, even assuming that prisoners are aware (and able to take advantage) of their limited ability to ask the board to change its mind. Because in the end the board's ability to reconsider based on a "change in [a prisoner's] circumstance or where the Board receives new information," *ibid.*, is entirely discretionary, free of all standards, an 8-year period before further consideration of parole made solely upon review of an inmate's file has to create a real risk of longer confinement.

A further word about the absence of record evidence of practice under the new Rule is in order. One reason that there is none is that Georgia resisted discovery. In this Court, it sought to compensate for the absence of favorable evidence by lodging documents recounting parole reconsiderations before the mandatory reconsideration date. But every instance occurred after the Eleventh Circuit had ruled against the State.[4] These examples of reconsiderations are the parole equivalent of fixing the broken front steps after the invited guest has slipped, fallen, and seen a lawyer; they do nothing to show that the board's own interpretation of its policy mitigated the risk of increased punishment.[5]

---

[4] Georgia's statistics show only that, in fiscal year 1999, about 20% of inmates received reconsideration dates of three years or less; about 10% got reconsideration dates more than three years but less than eight, and 70% got 8-year dates. See App. to Reply Brief for Petitioners 9. Eighty percent were therefore at least potentially negatively affected by the change from a 3-year to an 8-year delay in reconsideration. Even on their own terms, then, the statistics do not show that board policies mitigate the substantial risk of increased punishment.

[5] Indeed, as the board explains its decisionmaking procedures, "[t]he overriding factor in determining whether or not to parole a person under life sentence is the severity of the offense." Georgia Board of Pardons

I also dissent from the Court's failure to require discovery on remand. At the very least, the record gives reason to expect that discovery could show that the affected class has been subjected to the risk of increased sentences. *Morales* stressed that the question of what changes will be " 'of sufficient moment to transgress the constitutional prohibition' *must* be a matter of 'degree,' " 514 U. S., at 509 (citation omitted) (emphasis in original). Even if I am wrong and respondent cannot prevail on this record, it is plain that further discovery is justified to determine the degree to which the change at issue here altered sentence lengths.

and Paroles, Parole Decisions (visited Mar. 2, 2000), http://www.pap. state.ga.us/Decisions.htm. If we accept the board's statements, changed circumstances or new information would rarely make a difference.