In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-3466

ERIC A. GLASCOE,

*Petitioner-Appellant,*

*v.*

MARK A. BEZY,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 03 C 134—**John Daniel Tinder**, *Judge.*

ARGUED JUNE 1, 2005—DECIDED AUGUST 30, 2005

Before BAUER, RIPPLE, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Eric A. Glascoe is a District of Columbia prisoner currently held in the United States Penitentiary in Terre Haute, Indiana. Glascoe's parole application was reviewed and denied under parole guidelines enacted approximately fourteen years after his conviction. Glascoe filed a petition for writ of habeas corpus, challenging the denial of parole under the Constitution's Ex Post Facto Clause. The petition was dismissed by the district court. We affirm.

## I. History

Glascoe was convicted of sodomy and assault with intent to commit rape while armed, crimes which involved kidnapping his victim, forcing her to perform oral sex, and attempting to rape her at knifepoint. *Glascoe v. United States*, 514 A.2d 455, 458-59 (D.C. 1986). For this he was sentenced, in 1985, to life in prison. He was required to serve a minimum of 220 months before becoming eligible for parole. In a separate proceeding, Glascoe was convicted of attempting to throw his girlfriend out of a third-story apartment window and of slashing her face with broken glass. The sentence for this conviction, also entered in 1985, was three to nine years' imprisonment. The two sentences were to be served consecutively, resulting in an aggregate minimum term of 21 years and 4 months. The parties agree that Glascoe became eligible for parole September 23, 1999.[1]

In 1985, when Glascoe was sentenced, parole decisions were made by the District of Columbia Board of Parole (the "Board") according to the guidelines it had promulgated in 1981. Under these guidelines, the Board had discretion to grant parole after a prisoner's minimum sentence had been served if it found "a reasonable probability that [the] prisoner will live and remain at liberty without violating the law, [and] that his release is not incompatible with the welfare of society[.]" 9 D.C.R.R. § 105 (1981). The 1981 guidelines also directed the Board to take into account the following six factors in making its parole determination:

---

[1] The Sentence Computation Forms included in Glascoe's appendix also indicate a parole eligibility date of September 23, 1999, and an aggregated minimum term of 21 years and 4 months. Considering that the offenses were committed in late 1983, it is unclear how the 21 years and 4 months were served by 1999; nevertheless, because both sides agree that Glascoe was eligible for parole in 1999, we proceed to the merits of Glascoe's challenge.

(a) The offense, noting the nature of the violation, mitigating or aggravating circumstances and the activities and adjustment of the offender following arrest if on bond or in the community under any pre-sentence type arrangement.

(b) Prior history of criminality noting the nature and pattern of any prior offenses as they may relate to the current circumstances.

(c) Personal and social history of the offender, including such factors as his family situation, educational development, socialization, marital history, employment history, use of leisure time and prior military experience, if any.

(d) Physical and emotional health and/or problems which may have played a role in the individual's socialization process, and efforts made to overcome any such problems.

(e) Institutional experience, including information as to the offender's overall general adjustment, his ability to handle interpersonal relationships, his behavior responses, his planning for himself, setting meaningful goals in areas of academic schooling, vocational education or training, involvements in self-improvement activity and therapy and his utilization of available resources to overcome recognized problems. Achievements in accomplishing goals and efforts put forth in any involvements in established programs to overcome problems are carefully evaluated.

(f) Community resources available to assist the offender with regard to his needs and problems, which will supplement treatment and training programs begun in the institution, and be available to assist the offender to further serve in his efforts to reintegrate himself back into the community and within his family unit as a productive useful individual.

*Id.* § 105.1.

In 1998, the responsibility for making parole determinations was transferred to the United States Parole Commission (the "Commission"). *See* D.C. Code § 24-131. The Commission constructed new parole guidelines in 1999, found at 28 C.F.R. § 2.80 (1999).[2] The 1999 guidelines provide for calculation of a parole eligibility score based on point values for certain pre- and post-incarceration factors. *See id.* The first step in calculating an applicant's total score is to determine his Salient Factor Score ("SFS"), which is based on the following factors: (1) number of prior convictions adjudicated; (2) prior commitments of more than 30 days; (3) age when offense was committed; (4) recent commitment-free period; (5) probation/parole/confinement/escape violations; and (6) older offender status. *See* 28 C.F.R. § 2.20 (1999). The SFS is converted to a Base Point Score based on the violence in the underlying offense and other offenses. *See* 28 C.F.R. § 2.80 (1999). Points may then be added for negative institutional behavior such as assault on a correctional staff member, possession of a weapon, fire-setting, drugs, or rioting. *See id.* Finally, points may be subtracted for achievement in the area of prison programs, industries, or work assignments. *See id.* A higher total score translates to a lower likelihood of parole. The 1999 guidelines grant the Commission discretion to make parole decisions outside of the parameters described above in "unusual circumstances" where relevant, case-specific factors that are not adequately taken into account are present. *See id.*

Approximately two months before Glascoe's parole eligibility date, in July 1999, he had a hearing before the

---

[2] The 1999 guidelines no longer apply to District of Columbia offenders as they were replaced by another set of presumptive guidelines. *See* 28 C.F.R. § 2.80 (2004).

Commission. Employing the 1999 guidelines, the Commission denied parole. First, Glascoe was given an SFS based on two prior convictions, no prior commitments of 30 days, his age at the time of the offense (23), and a recent commitment-free period. This SFS was adjusted upward for violence in the underlying offense, so Glascoe had a Base Point Score of 5. Two points were added to that score for negative institutional behavior: fighting with another inmate in 1991, threatening to kill a correctional officer in 1993, and possession of an 8½-inch shank in 1995. Glascoe had two other incidents of bad behavior which were noted in his hearing summary but not presented in the pre-hearing review: he possessed a razor blade in 1993, and he sent a threatening letter to his girlfriend in 1996. With these points added, and a point subtracted for ordinary program achievement, Glascoe was left with a total score of 6 points, which translated to a denial of parole (an inmate scoring 3 or higher was denied parole under the guidelines) and a rehearing in 18 to 24 months. Finding that Glascoe was a "more serious risk than indicated by [his] Base Point Score," that he was "an offender with deep seated homicidal impulses toward female victims . . . not likely to be deterred by [his] present incarceration[,]" and that, given his prison record, "prison programming is not likely to achieve . . . rehabilitation within the time frame allowed[,]" the Commission exercised its discretion to delay Glascoe's rehearing until he served 60 additional months in prison.

Glascoe had been incarcerated at the Sussex II State Prison in Waverly, Virginia, at the time of his parole hearing. Arguing that use of the 1999 guidelines violated the Ex Post Facto Clause, he filed a writ of habeas corpus in the District Court for the District of Columbia in September 2001. Glascoe was later moved to the United States Penitentiary in Terre Haute, Indiana. His petition was transferred to the District Court for the Southern District of Indiana in May 2003. The district court rejected Glascoe's

ex post facto challenge and dismissed his petition with prejudice in September 2003.

## II. Analysis

The question of whether the Commission's application of the 1999 guidelines, as opposed to those in effect at the time of Glascoe's conviction, violates the Constitution's Ex Post Facto Clause is a question of law which must be reviewed *de novo. See Rodriguez v. United States*, 286 F.3d 972, 978 (7th Cir. 2002). The Constitution prohibits Congress from passing any ex post facto law. U.S. Const. art. I, § 9, cl. 3. In order to fall within the ex post facto prohibition, a "law must be retrospective, that is, it must apply to events occurring before its enactment; and . . . it must disadvantage the offender affected by it." *Miller v. Florida*, 482 U.S. 423, 430 (1987) (internal quotations and citations omitted).

We addressed an ex post facto challenge to parole guidelines in *Prater v. U.S. Parole Commission*, 802 F.2d 948 (7th Cir. 1986) (en banc). In that case, the petitioner was denied parole under guidelines that were promulgated after his crime was committed. *Id.* at 951. There were also different parole statutes in force at the time of his conviction and the time of his parole hearing, but the changes were "of form rather than substance" and the two statutes were deemed to "have the same meaning." *Id.* at 955. We held that the petitioner was not subjected to ex post facto punishment because the guidelines under which he was sentenced were simply a statutorily authorized interpretation of the parole statute rather than an exercise of delegated legislative authority which would amount to a "law" for constitutional purposes. *Id.* at 953-54. Noting that there was adequate evidence that parole would have been denied under the old statute with an offense so egregious as the petitioner's, the en banc court vacated the panel's original decision to remand the case in order to give the petitioner a chance to

show that the new statute as administered (with the new guidelines) was harsher than the old statute as administered. *See id.* at 956.

The Supreme Court subsequently entertained an ex post facto challenge to parole procedures in *Garner v. Jones*, 529 U.S. 244 (2000). The inmate in *Garner* argued that a new rule changing the frequency of required reconsideration hearings for inmates serving life sentences from every three years to every eight years was unconstitutional. *Id.* at 247. The Court stated that the new rule was not facially more onerous than the former rule, so the controlling inquiry was whether retroactive application of the new rule "create[d] a significant risk of prolonging respondent's incarceration." *Id.* at 251. Finding that the record was insufficient to show whether the change in parole law would lengthen the inmate's actual time in prison, the Court remanded the case for a determination of fact as to whether the new rule created a significant risk of increased punishment. *Id.* at 256.

Glascoe urges that *Prater* must be overruled in light of *Garner*, and that *Garner* compels a review of Glascoe's parole application under the 1981 guidelines. We do not agree that *Prater* categorically denies the possibility that parole guidelines could be subject to the Ex Post Facto Clause. *See Prater*, 802 F.2d at 954 (stating that the parole guidelines were not laws within the meaning of the Ex Post Facto Clause "at least so far as relevant to this case"). Similarly, *Garner* does not categorically bring every change in parole guidelines within the realm of the Ex Post Facto Clause—even when, as is arguable in this case, the new guidelines may be harsher in some factual circumstances. *See Garner*, 529 U.S. at 255 (decreasing frequency of rehearings not a per se ex post facto violation). What *Garner* does do is confirm the possibility that changes to parole practices may, in some instances, violate the Ex Post Facto Clause and provides the test for determining whether

a violation has occurred: when the new practice is not harsher than the old one on its face, there is an ex post facto problem if the new practice "created a significant risk of increasing [the inmate's] punishment." *See id.*

In considering whether a facial challenge to the 1999 guidelines in this case can succeed, we find it important that in *Garner* the Supreme Court reversed the Eleventh Circuit, which had supposed that the new parole rule changing frequency of rehearing from every three years to every eight years "'seem[ed] certain' to result in some prisoners serving extended periods of incarceration." *Id.* A new rule decreasing the frequency of parole hearings was not deemed facially more onerous for inmates. *Id.*; *cf. Henderson v. Scott*, 260 F.3d 1213, 1217 (10th Cir. 2001) (finding statutory amendment providing for less frequent parole reconsideration not to be an ex post facto violation on its face). The difference between the 1999 guidelines used at Glascoe's parole hearing and the 1981 guidelines in force at the time of his conviction presents an even weaker case for a facial ex post facto problem. Both sets of guidelines applied the same parole statute. *See* D.C. Code §24-204. The later guidelines consider many of the same factors as the earlier guidelines, including the nature of the underlying offense and institutional behavior. The later guidelines quantify these factors—preserving the discretion of the parole decision-making body—ostensibly in an effort to increase uniformity and predictability.

The proper question to ask, then, is whether the new procedure creates a significant risk of increased punishment for Glascoe. This is not to be confused with the question of whether the new parole practice is harsher for a class of prisoners generally; we must focus on the consequence of the new practice on the sentence of the particular inmate bringing the challenge: "[the petitioner] must show that as applied to his own sentence the law created a

significant risk of increasing his punishment." *Garner*, 529 U.S. at 255. Indeed, the Supreme Court stated in a decision five years before *Garner* that "the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change . . . increases the penalty by which a crime is punishable." *California Dep't of Corrections v. Morales*, 514 U.S. 499, 506 n.3 (1995). This approach has been taken by a number of other courts in the wake of *Garner* as well. *See, e.g.*, *Henderson*, 260 F.3d at 1217 ("[Petitioner] could still prevail upon a showing that . . . application [of a statute increasing time between parole hearings] in his case would result in a significant risk of a longer period of incarceration."); *Pindle v. Poteat*, 360 F. Supp. 2d 17, 20 (D.D.C. 2003) (addressing an ex post facto challenge of the same 1999 guidelines in this case and stating that the issue was whether these guidelines resulted in an "increase in the time in which petitioner is likely to spend in custody").

The answer to this question in Glascoe's case makes it unnecessary for us to evaluate the government's argument that the parole procedures under attack in this case are simply discretionary *guidelines*, unlike statutes or the "rules" addressed in *Garner*, and not within the ambit of the Ex Post Facto Clause. *See Warren v. Baskerville*, 233 F.3d 204, 208 (4th Cir. 2000) (holding, post-*Garner*, that a change in administrative parole policy revoking previously earned good time credits was not subject to the Ex Post Facto Clause); *Pindle*, 360 F. Supp. 2d at 20 (collecting authority for the proposition that parole guidelines cannot be considered "laws" for purpose of the Ex Post Facto Clause). *But see Fletcher v. District of Columbia*, 391 F.3d 250, 251 (D.C. Cir. 2004) (holding that parole guidelines are subject to the Ex Post Facto Clause). Even assuming the guidelines at issue in Glascoe's case are within the realm of the Ex Post Facto Clause, Glascoe cannot show that the

application of the 1999 guidelines created a significant risk of increased punishment for him.

The Commission denied parole for Glascoe on the basis of his extremely violent crimes and his institutional misconduct. These factors would have been considered under the 1981 guidelines, which clearly enumerated both as relevant to a parole decision. Moreover, the Commission exercised its discretion—as it would have been entitled to do under the 1981 guidelines as well—to depart from the guidelines and set Glascoe's rehearing for 60 months later rather than the 18-24 months indicated by Glascoe's score. Explaining its decision to depart from the guidelines, the Commission stated that Glascoe was "a more serious risk than indicated by [his] Base Point Score," that he had "deep seated homicidal impulses toward female victims . . . not likely to be deterred by [his] present incarceration," and that his "prison record further indicates that prison programming is not likely to achieve . . . rehabilitation within the time frame allowed by [his] point score." There can be no doubt that the Commission would have denied parole for Glascoe had it been operating under the 1981 guidelines, which only allowed parole if the released prisoner would "live in society without violating his parole conditions" and "release was not incompatible with the welfare of society." At the most, "it is only remote speculation to suggest that the application of the [1999 guidelines] in Mr. [Glascoe's] case will increase his punishment[.]" *See Henderson*, 260 F.3d at 1217.

Glascoe asserts that he is entitled, at a minimum, to a remand and a chance to engage in discovery to show that a change in parole guidelines adversely impacted his application. Discovery in habeas corpus actions is extremely limited. *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997). This is not a case with "good cause" that warrants discovery. *See Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir. 1990). Although Glascoe contrasts the "rehabilita-

tive" purpose of the 1981 guidelines with the "punitive" nature of the 1999 guidelines, he has not presented evidence of rehabilitation that would cause him to fare better under the 1981 guidelines, which, if it exists, would be obtainable without formal discovery procedures. Glascoe does claim that he stopped using drugs in 1996. We note that the bad behavior of threatening his girlfriend took place in that same year, and that achievement in prison programs is, in fact, a possible way to get a better score under the 1999 guidelines.[3]

### III.  Conclusion

There might be a case where application of the 1999 guidelines rather than the 1981 guidelines substantially increases an inmate's risk of increased punishment so as to violate the Ex Post Facto Clause. There might also be a case where discovery could be required to determine whether or not an inmate would fare worse under the later guidelines. But this is not such a case; the record shows that Glascoe would have been denied parole under either set of guidelines, and there is no ex post facto violation. The district court's dismissal of Glascoe's petition for writ of habeas corpus is AFFIRMED.

A true Copy:

 Teste:

---

[3] Glascoe received a one-point reduction for "ordinary" achievement in prison programs. Two points may be deducted for "superior" program achievement, and per the guidelines, "[t]he Commission may, in its discretion, grant more than a 2 point deduction" in exceptional cases. 28 C.F.R. § 2.80 (1999).

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—8-30-05