STATE *ex rel.* NEILSON *v.* HARWOOD, Warden.

(*Nashville*, December Term, 1945.)

Opinion filed May 4, 1946.

BEN WEST, of Nashville, for petitioner Neilson.

ERNEST F. SMITH, Assistant Attorney-General, for Warden.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

Neilson, an inmate of the state prison, filed a petition for *habeas corpus* herein seeking his discharge from confinement. The warden of the penitentiary answered and after a hearing the criminal court ordered the release of the prisoner and the warden appealed to this Court.

Pursuant to the order of the criminal judge Neilson was released and placed in a hospital or nursing home at Nashville, he being in a low state of health. The warden filed a petition seeking to supersede the order of discharge and this Court granted a stay order leaving Neilson in the hospital under the supervision of the warden pending the disposition of the appeal of the latter in this Court.

Neilson was charged with the murder of his wife. He was found guilty of murder in the first degree and given a life sentence. This judgment was affirmed by this Court

and he was committed to the penitentiary in February, 1929. Under our statutes, for purposes of parole, a life sentence is reckoned as a sentence for a minimum of twenty-five years. With statutory credits for good behavior Neilson became eligible to parole some months since. There was a hearing before the Board of Paroles and Neilson's application was favorably considered and he was, in the language of the Board, ''recommended for parole.''

Some steps appear to have been taken looking toward the release of the prisoner but before his discharge was effected the Board considered the matter further and reconsidered its former action. The prisoner therefore remained in the penitentiary and filed this petition for *habeas corpus*.

█ The parole system came into vogue in Tennessee as part of the indeterminate sentence law, chapter 8 of the Acts of 1913. From the first the granting of a parole in a particular case was held to be a matter of discretion with the authority vested with the power.

█ In *Woods* v. *State*, 130 Tenn. 100, 169 S. W. 558, L. R. A. 1915F, 531, which discussed the Act of 1913 in detail and sustained its validity, it was said that before granting a parole ''the Board must believe, from the history of the prisoner and his conduct during his service of the minimum term, that during his qualified liberty under the parole he will probably not violate the law, and generally that his release on parole will not be incompatible with the interests of society.'' (130 Tenn. at page 112, 169 S. W. at page 561, L. R. A. 1915F, 531).

This was affirmed in *State ex rel.* v. *Rimmer*, 131 Tenn. 316, 174 S. W. 1134, in which case it was insisted that a prisoner was entitled to his parole as a matter of right

after serving his minimum term. This contention was expressly overruled.

The power to grant paroles has been conferred on different functionaries by legislative acts since the system was instituted and finally by chapter 276 of the Acts of 1937 on "the Division of Pardons, Paroles and Probation" created by that act. This act probably covers the whole subject. At least it repeals by implication previous legislation along that line so far as there is any conflict.

Preserving the discretionary power of the Board of Paroles with reference to the grant of such relief are Section 8 and Section 9 of the Act of 1937 as follows:

"Sec. 8. Prisoners Subject to Parole.—Be it further enacted, That every person sentenced to an indeterminate sentence and confined in a State prison, when he has served a period of time equal to the minimum sentence imposed by the court for the crime of which he was convicted, shall be subject to the jurisdiction of the Board. The time of his release shall be discretionary with the Board, but no such person shall be released until he has served such minimum sentence nor until he shall have served one year. The action of the Board in releasing prisoners shall be deemed a judicial function and shall not be reviewable if done according to law.

"Sec. 9. Reasons for Release.—Be it further enacted, That no prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board is of opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society. If the Board shall so determine, such prisoner shall be allowed to go upon parole outside of prison walls and inclosure upon such terms

and conditions as the Board shall prescribe, but to remain while thus on parole in the legal custody of the warden of the prison from which he is paroled, until the expiration of the maximum term specified in his sentence.''

■ Section 46 of chapter 20 of the Acts of 1915 and Section 2 of Chapter 163 of the Acts of 1915 provide certain specific credits of time to be allowed a prisoner for each year of his sentence conditioned on his good behavior. His good behavior appearing, he is entitled to these credits as a matter of right. They are said to enter into and become a part of his sentence. *Gilliam* v. *State,* 174 Tenn. 388, 126 S. W. (2d) 305, and cases cited. The eligibility of a prisoner to parole at the expiration of the minimum term of his sentence also enters into the judgment of conviction but the right to a parole at such time rests in the discretion of the Board of Paroles. *Wood* v. *State, supra.*.

■ The relator here insists that everything was done by the Board of Paroles in his case necessary to entitle him to the relief sought, that his right to discharge from prison was settled by the first action taken by the Board, and that the warden accordingly is holding relator illegally. We cannot accept this view.

In the first place no order or official communication has been issued from the Board of Paroles to the warden of the penitentiary. The relator was committed to the custody of that official under an order of this Court and prior to the expiration of his maximum term less credits it would be a dereliction of duty for the warden to free a prisoner without some authority.

■ Moreover procedure necessary to the discharge of a prisoner on parole was never completed in this case. It was made the duty of the Board of Paroles by the Act of 1937, as well as by previous statutes, to fix the condi-

tions upon which a parole should be issued. It is further the duty of the Board to assist the parolee in procuring employment and to inquire into conditions which the latter will meet upon his release.

Under the proof in this case it is the custom of the warden to furnish the Board of Paroles from time to time with a list of prisoners whose minimum terms are about to expire. Thereupon the Board inquires into each case and makes a "recommendation" in each case, returning the list to the warden with the recommendations indicated. If a recommendation is favorable, the warden or his subordinates at the penitentiary communicates with the prisoner, puts the latter in touch with the Board, and after conference with the prisoner and inquiries the Board determines the conditions upon which the prisoner shall be released and these conditions being met, a discharge follows.

In this case it was proposed to place Neilson in the care of certain relatives in the State of Alabama. There appears to be some sort of arrangement between Tennessee and Alabama whereby parole officers of Alabama will look after paroled prisoners from Tennessee if Alabama agrees to accept the Tennessee parolee into that State. The Alabama authorities first agreed to accept Neilson, but pending reconsideration of its former action by the Tennessee Board of Paroles, the Alabama officials definitely withdrew their former acceptance and refused to allow Neilson to come into that State as a parolee.

The record shows that Neilson is in a very low state of health. His physical condition is such that he could not possibly earn his own living and indeed would not be able to survive without assistance. The proof does not indicate that any arrangement for the care of this prisoner, which was satisfactory to the Board of Paroles,

had been tendered that body when the petition for *habeas corpus* herein was filed. It would not be humane to turn Neilson out in the world until some such arrangement had been made and the nature of that arrangement is a matter within the discretion of the Board. Until a program, as it is called, for the future custody and care of the prisoner is approved by the Board, he is not entitled to his release.

Insisting that the first action of the Board of Paroles in this case entitled Neilson to his release, it is further argued that subsequent proceedings before the Board resulting in a reconsideration of the grant of parole were illegal and in violation of a statutory provision in effect at the time of Neilson's conviction. The reference is to Section 3 of Chapter 8 of the Acts of 1913, a portion of which section is as follows:

"In considering application for parole or for recommendation for final release, said Board shall not entertain any petition, or hear any argument, from any attorney or other person not connected with the penitentiary, in favor or against the parole or release of any prisoner; but it may institute inquiries by correspondence, by taking testimony, or otherwise, as the history, physical, or mental condition or character of such prisoner, and each member of said Board is hereby authorized to administer oaths to witnesses for every such purpose."

It is charged that after making its recommendation for parole the Board of Paroles received protests from outside parties, heard evidence from outside parties, and heard attorneys for those parties and then reconsidered the recommendation. All of such procedure, it is said, was forbidden by the Act of 1913.

We think the provision quoted from the Act of 1913 is abrogated by certain provisions of chapter 276 of the Acts of 1937. The latter Act, in Section 2, provides:

"The Board shall make all necessary rules and regulations for the proper conduct of its work."

And again, section 3 provides:

"The Board for the purpose of any investigation in the performance of its duties made by it or any member thereof, shall have the power to issue subpoenas, compel the attendance of witnesses and the production of books, papers and other documents pertaining to the subject of its inquiry. It or any member thereof may administer oaths and take the testimony of persons under oath."

 We are of opinion that the unlimited power conferred on the Board to make "necessary rules and regulations for the proper conduct of its work" and the power to compel the attendance of witnesses generally, together with documents, etc., by necessary implication repeals so much of the Act of 1913 as restricted its power to hear argument from attorneys or other persons not connected with the penitentiary and restricted its power of taking evidence except by exercising that function through correspondence.

 It is suggested that such change in the law affects the constitutional rights of the relator but we do not find merit in this argument. No right of the relator, existing at the time of his conviction, is touched by the Act of 1937. His right to a parole at the expiration of his minimum sentence was left subject to the discretion of the Board of Paroles as it was before. Only the matter of procedure in the consideration of an application for parole was affected by the language quoted from the Act of 1937. In other words, the remedy, not the right, was affected and so long as the new remedy is adequate, relator has no just ground of complaint. *Sherrill* v. *Thomason*, 145 Tenn. 499, 520, 238 S. W. 876, and authorities collected.

For the reasons stated, we think the court below erred in ordering the release of relator under existing circumstances. Evidently he is nothing but a burden to the State at present and doubtless the Board of Paroles will be much inclined to release him upon a satisfactory program being arranged with that Board for his future care and custody. Proof in this record tends to show that Neilson is now afflicted with incurable maladies. Since Providence, as well as the State, has laid a heavy hand upon him, there is little point to any argument about the adequacy of his punishment for the crime of which he was convicted.

Reversed and dismissed.