IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 7, 2015

## WILLIAM W. YORK v. TENNESSEE BOARD OF PAROLE

**Appeal from the Chancery Court for Davidson County**
**No. 131480I     Claudia Bonnyman, Chancellor**

_____

**No. M2014-02283-COA-R3-CV – Filed April 19, 2016**
_____

This appeal arises from the denial of parole. The Tennessee Board of Probation and Parole found that the inmate's release from custody would depreciate the seriousness of the crime of which he was convicted. The inmate filed a petition for common law writ of certiorari, alleging violations of the Ex Post Facto Clause of the state and federal constitutions. The trial court dismissed the petition. On appeal, the inmate alleges the same state and federal constitutional violations. He also argues that the trial court erred in not letting him conduct discovery and in relying on an affidavit filed in support the Board's decision. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Davidson County Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

William W. York, Mountain City, Tennessee, appellant, pro se.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; and Pamela S. Lorch, for the appellee, Tennessee Board of Probation and Parole.

## OPINION

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On May 30, 1977, William W. York and two others, Clifford T. Caudill and Wes Finley, Jr., robbed the Hawkins Jewelry Store in Madison, West Virginia. *State v. Caudill*,

289 S.E.2d 748, 750 (W. Va. 1982).

> The proprietors of the store, Aubrey and Alberta Hawkins, were held at gunpoint during the robbery by Caudill and York. Finley waited in [Caudill's] car in an alley behind the jewelry store.
>
> After robbing the store, Caudill and York forced Mr. and Mrs. Hawkins to accompany them as they fled. They put Mr. and Mrs. Hawkins in the back seat of [Caudill's] car and left Madison on a highway known as Corridor G. Shortly thereafter the Hawkins were placed in the trunk of the car and held captive. On June 3, 1977, they were found dead near Jellico, Tennessee.

*Id.* In West Virginia, York was convicted of armed robbery and two counts of kidnapping. In Tennessee, as part of a plea agreement, York pled guilty to two counts of first degree murder for which he received two concurrent life sentences.

York began serving his sentence with the Tennessee Department of Correction in 1989. Since that time, York has unsuccessfully sought release on parole. In each instance, York has resorted to the courts to challenge the statutory and regulatory scheme for determining parole eligibility.

York became eligible for parole consideration in July 2001. *York v. Tenn. Bd. of Prob. and Parole*, No. M2003-00822-COA-R3-CV, 2004 WL 305791, at *1 (Tenn. Ct. App. Feb. 17, 2004) (hereinafter "*York I*"). The Tennessee Board of Probation and Parole (the "Board") denied parole. York appealed, arguing due process, equal protection, and ex post facto violations. *Id.* This Court affirmed the Board's denial of parole based on the seriousness of the offense. *Id.* at *3. However, we concluded that the Board's deferral of parole consideration for ten years was arbitrary and remanded for reconsideration of York's next parole review date. *Id.* at *4.

On remand, the trial court directed the Board to hold a hearing to set a new parole review date. *York v. Tenn. Bd. of Prob. and Parole*, M2005-01488-COA-R3-CV, 2007 WL 1541360, at *1 (Tenn. Ct. App. May 25, 2007) (hereinafter "*York II*"). On January 4, 2005, the Board conducted the ordered hearing, but rather than only scheduling a new parole review date, the Board again denied York parole based on the seriousness of his offense. *Id.* The Board set a new parole hearing for January 2011. *Id.*

In his appeal from the January 4, 2005 review hearing, York again argued that "the existing statutory and regulatory scheme denied him equal protection and due process and further constituted a violation of the Ex Post Facto Clause" and that denial of parole "based solely upon the 'seriousness of the crime'" was unconstitutional. *Id.* at *2. We made short work of those arguments, noting that they had been addressed and rejected in the prior

2

appeal. *Id.* We also concluded that the Board's decision to defer parole consideration for six years was appropriate but modified the judgment such that the six-year period would run from York's parole hearing in July 2001. *Id.* at *6.

In January 2008, York again came before the Board, and again the Board denied parole based solely on the seriousness of the offense. *York v. Tenn. Bd. of Prob. and Parole*, No. 3:08-CV-1093, 2010 WL 3522330, at *1 (M.D. Tenn. Aug. 12, 2010). York responded by asserting a claim under 42 U.S.C. § 1983 in federal court. *Id.* at *5. Specifically, York alleged that,

> "In denying [him] parole on January 7, 2008, the Tennessee Board of Probation and Parole retroactively used current parole laws, policies, and practices that were different from those in effect when [he] committed his crimes in June 1977; and the effect of these changes, individually and cumulatively, created a harsher substantive standard for parole creating a sufficient risk of increased punishment to violate the *Ex Post Facto Clause* of the United States Constitution, Article 1 Section 10."

*Id.* at *1. The Board moved for summary judgment, and a magistrate judge recommended the motion be granted. *Id.* Based on the record, the magistrate judge found that York had "failed to demonstrate that the 2008 parole laws, policies, or practices 'alter[ed] the definition of criminal conduct or increase[d] the penalty by which a crime is punishable." *Id.* at *7 (citation omitted). The court ultimately adopted the recommendation and dismissed York's case. *York v. Tenn. Bd. of Prob. and Parole*, No. 3-08-1093, 2010 WL 3522328, at *1 (M.D. Tenn. Sept. 3, 2010).

York last appeared for a parole review hearing on July 1, 2013. The Board denied York parole because "release from custody . . . would depreciate the seriousness of the crime of which the offender stands convicted or promote disrespect of the law."

On October 22, 2013, York filed a petition for writ of certiorari with the Davidson County Chancery Court. The Board did not oppose the issuance of the writ, and the court ordered that the record from the July 1, 2013 parole review hearing be prepared and filed.

In accordance with local rule,[1] York filed a brief, and the Board filed a responsive brief. The Board appended to its responsive brief an affidavit of a long-time member of the Board, Charles Traughber, which had previously been filed in York's federal case. Shortly after the Board filed its responsive brief, York filed interrogatories and requests for

---

[1] Davidson County Local Rule of Practice 25 requires briefs in "all cases heard by the court upon the record from an administrative tribunal or agency." Local Rules of Practice of the Courts of Record of Davidson County § 25.01.

document production directed to the Board. Over thirty days later, apparently having failed to receive any responses to his discovery, York filed a motion to compel. In response to the motion, the Board argued that, briefs having been filed, "the discovery process [wa]s moot." The Board also argued "the scope of review on a writ of certiorari is very narrow and discovery is not a normal part of the process."

Ultimately, the court denied the motion to compel and dismissed York's petition. On appeal, York argues that the application of the "seriousness of the crime" standard and certain victims' rights are ex post facto violations. York further argues that the trial court erred in considering the affidavit of Mr. Traughber and in not permitting discovery.

## II. ANALYSIS

The grant of parole is a discretionary matter, vested exclusively in the Board. *Doyle v. Hampton*, 340 S.W.2d 891, 893 (Tenn. 1960). "Prisoners do not have an absolute right to be released from [prison] prior to the expiration of their sentences." *Hopkins v. Tenn. Bd. of Paroles and Prob.*, 60 S.W.3d 79, 82 (Tenn. Ct. App. 2001). Accordingly, parole is considered a privilege and not a right. Tenn. Code Ann. § 40-35-503(b) (2014); *Stewart v. Schofield*, 368 S.W.3d 457, 463 (Tenn. 2012).

A writ of certiorari is the "procedural vehicle through which prisoners may seek review of decisions by prison disciplinary boards, parole eligibility review boards, and other similar administrative tribunals." *Settle v. Tenn. Dep't of Corr.*, 276 S.W.3d 420, 425 (Tenn. Ct. App. 2008). Review is limited to a narrow examination of "whether the Board exceeded its jurisdiction, or acted illegally, fraudulently, or arbitrarily." *Arnold v. Tenn. Bd. of Paroles*, 956 S.W.2d 478, 480 (Tenn. 1997). We do not review the "intrinsic correctness of the Board's decision." *Stewart*, 368 S.W.3d at 465.

### A. EX POST FACTO CLAIMS

The United States Constitution prohibits states from enacting an ex post facto law. U.S. Const. art. I, § 10, cl. 1. The Tennessee Constitution also prohibits ex post facto laws. Tenn. Const. art. I, § 11. Under both constitutions, the prohibition "bar[s] enactments which, by retroactive operation, increase the punishment for a crime." *Garner v. Jones*, 529 U.S. 244, 249 (2000); *Miller v. State*, 584 S.W.2d 758, 761 (Tenn. 1979) (Ex Post Facto Clause of the Tennessee Constitution is "sufficiently broad to proscribe the application of a statute fixing punishment in excess of that provided by a law in effect at the time of the commission of an offense."). In some instances, retroactive alterations in laws governing parole can implicate the ex post facto prohibition. *Garner*, 529 U.S. at 250; *Kaylor v. Bradley*, 912 S.W.2d 728, 732 (Tenn. Ct. App. 1995).

York argues the Board violated the ex post facto provisions of both the state and

4

federal constitutions by applying parole review standards and practices at his parole hearing not in effect at the time of his conviction. We place his ex post facto challenges into two broad categories: the first being Board consideration of the seriousness of his crime and the second being victim input in the parole process.

1.  Seriousness of the Crime

Under the standards applicable at the time of York's parole hearing, no inmate could be granted parole if the Board made any of the following findings:

> (1) There is a substantial risk that the defendant will not conform to the conditions of the release program;

> (2) The release from custody at the time would depreciate the seriousness of the crime of which the defendant stands convicted or promote disrespect for the law;

> (3) The release from custody at the time would have a substantially adverse effect on institutional discipline; or

> (4) The defendant's continued correctional treatment, medical care or vocational or other training in the institution will substantially enhance the defendant's capacity to lead a law-abiding life when given release status at a later time.

Tenn. Code Ann. § 40-35-503(b) (2014). Our Legislature adopted the statute mandating denial of parole if release "would depreciate the seriousness of the crime" in 1989, well after York committed his crimes.[2] Although there have been amendments to the statute since its

---

[2] Although Tennessee Code Annotated § 40-35-503(b) was not adopted until 1989, the seriousness of the inmate's offense was among the criteria considered by the Board in granting or denying parole as far back as 1976. The regulations governing the then Board of Pardons and Paroles provided as follows:

> (h)   In order to establish a written paroling policy and promote a more consistent exercise of discretion, and enable a fairer and more equitable decision-making without removing individual case consideration, the Tennessee Board of Pardons and Paroles adopts the following guidelines;

> 1.   All eligible offenders will be released on parole when he or she is first eligible unless the Board, by majority vote, decides that one or more of the following four conditions exists:

> (i) There is a substantial indication that he/she will not conform to the conditions of parole.

adoption, the amendments have not impacted the findings that would result in denial of parole.

We conclude that York is collaterally estopped from raising an ex post facto claim based on the seriousness of the crime standard employed by the Board. "Collateral estoppel is a judicially created issue preclusion doctrine that promotes finality, conserves judicial resources, and prevents inconsistent decisions." *Mullins v. State*, 294 S.W.3d 529, 534 (Tenn. 2009) (footnotes and citations omitted); *see also State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 178 (Tenn. Ct. App. 2000) ("Collateral estoppel is an issue preclusion doctrine."). The doctrine of collateral estoppel renders the determination of a particular issue of law or fact conclusive on the parties and their privies where it has previously been "actually or necessarily determined by a court of competent jurisdiction." *Cihlar*, 39 S.W.3d at 178-79; *see also Mullins*, 294 S.W.3d at 535 ("[W]hen an issue has been actually and necessarily determined in an earlier proceeding between the parties, that determination is conclusive against the parties in subsequent proceedings."). To prevail on a collateral estoppel claim, the party seeking preclusion must demonstrate:

> (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded.

---

> (ii) His/her release at that time would depreciate the seriousness of the crime or promote disrespect for the law.
>
> (iii) His/her release would have substantially adverse effects on institutional discipline.
>
> (iv) His/her continued correctional treatment, medical care, or vocational or other training in the institution will substantially enhance his capacity to lead a law abiding life when released at a later date.

Tenn. Comp. R. & Regs. 0420-1-1-.09 (1976), *superseded by statute*, Pardons and Paroles Reform Act of 1979, 1979 Tenn. Pub. Acts 852, 868 (ch. 359 § 26). The Pardons and Paroles Reform Act of 1979 abolished the Board of Pardons and Paroles and created the autonomous Tennessee Board of Paroles. 1979 Tenn. Pub. Acts 853, 868. Upon its creation, the Tennessee Board of Paroles adopted the same guidelines for considering parole. Rules and Regulations of the Tennessee Board of Paroles 0420-1-1-.09(h), 5 Tenn. Admin. Reg. 346 (Aug. 1979).

*Mullins*, 294 S.W.3d at 535.

The first requirement for the application of collateral estoppel is met. When a party invokes the doctrine of collateral estoppel, we must identify the legal or factual issue decided in the earlier proceeding as well as the issue sought to be precluded in the later proceeding. *Id*. at 536. Here, in *York I*, we described the issues identified by York as the same as in another appeal, including whether "Tennessee Code Annotated section 40-35-503(b)(2), allowing the parole board to deny parole because of the seriousness of the offense for which he was convicted, is an ex post facto law." *York I*, 2004 WL 305791, at *2-3 (quoting *Dyer v. Tenn. Bd. of Paroles*, No. M1999-00787-COA-R3-CV, 2001 WL 401596, at *1-2 (Tenn. Ct. App. April 23, 2001)). In *York II*, we made clear that the constitutionality of Tennessee Code Annotated § 40-35-503(b)(2) was addressed in York's prior appeal. *York II*, 2007 WL 1541360, at *2.

Next we must consider whether the issue of an ex post facto violation was actually raised, litigated, and decided on the merits in *York I*. *See Mullins*, 294 S.W.3d at 535. An issue need not be subject to a full evidentiary and adversarial trial to be "actually litigated." *Id.* at 536. Rather, "[t]he requirement that an issue be 'actually litigated' is generally satisfied if the issue was properly raised by the proceedings or otherwise placed in issue and was actually determined in the prior proceeding." *Id*. Our review of *York I* and *York II* convinces us that it was. *See York I*, 2004 WL 305791, at *2-3; *York II*, 2007 WL 1541360, at *2; *but see Wilson v. Fullwood*, 772 F. Supp. 2d 246, 264 (D.D.C. 2011) (finding issue preclusion cannot apply to any issues from parole hearing not actually before the court in the previous case).

As to the third requirement for the application of collateral estoppel, our decision in *York I* is final. The fourth requirement is also quickly disposed of. The parties are identical in *York I*, *York II*, and this case.

The final requirement for the application of collateral estoppel is that the party against whom it is invoked had "a full and fair opportunity to litigate the issue now sought to be precluded." *Mullins*, 294 S.W.3d at 538. This requirement differs from the "actually litigated" requirement. *Id*. The "actually litigated" requirement focuses on the issues, while the "opportunity to litigate" requirement focuses on the parties. *Id*. This latter requirement rests on issues of fundamental fairness and warrants a redetermination of the issue sought to be precluded where "there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Id*. (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481 (1982)). Where the party sought to be precluded is the plaintiff, as is the case here, "it is appropriate to consider (1) the procedural and substantive limitations placed on the plaintiff in the first proceeding, (2) the plaintiff's incentive to litigate the claim fully in the first proceeding, and (3) the parties' expectation of further litigation following the conclusion of the first proceeding." *Id*. at 538-39 (footnotes omitted).

Although the analysis of whether the "seriousness of the crime" standard found in Tennessee Code Annotated § 40-35-503(b)(2) is an ex post facto violation is cursory in the prior cases, we conclude the final requirement for the application of the doctrine of collateral estoppel is satisfied. The cursory nature of the discussion of the ex post facto claim does not cause us to question the quality or fairness of the procedures followed in *York I* or *York II*. We are aware of no procedural or substantive limitations placed on York in his prior challenges to the statute, and we also find that York had ample incentive to litigate the issue.

In addition, as York points out, this is not the first instance in which the retroactive application of the seriousness of the offense standard has been tested as an ex post facto violation. In *Dyer v. Bowlen*, a divided panel of the United States Court of Appeals for the Sixth Circuit found the inmate failed to show the requisite risk of increased punishment in the language of Tennessee Code Annotated § 40-35-503(b)(2). 465 F.3d 280, 288-89 (6th Cir. 2006). The court then remanded with instructions to the district court "to conduct an evidentiary hearing on the practical effects of the statutes' retroactive application." *Id.* at 288.[3] Our review of *York I* does not indicate whether York attempted to show the practical effects of the application of Tennessee Code Annotated § 40-35-503(b)(2) in the prior litigation, but we cannot assume that he was denied that opportunity.

2. Victim Input

In 1993, as part of the Open Parole Hearings Act, the General Assembly enacted legislation requiring the Board to "receive and consider victim impact statements." Tenn. Code Ann. § 40-28-504(a) (2012). Later, in 1998, voters approved an amendment to the Tennessee Constitution guaranteeing victims a variety of rights, including "[t]he right to be present at all proceedings where the defendant has the right to be present" and "[t]he right to be heard, when relevant, at all critical stages of the criminal justice process as defined by the General Assembly." Tenn. Const. art. I, § 35. The General Assembly implemented article I, section 35, by defining key terms by statute.[4] Tenn. Code Ann. § 40-38-301(a) (2014). Pertinent to this appeal, the General Assembly defined "critical stages of the criminal justice process" to include "[a]ny parole hearing at which the defendant's release on parole will be discussed or determined" and "victim" to mean a family member if the victim is deceased.

---

[3] The dissenter in *Dyer v. Bowlen* would have found retroactive application of Tennessee Code Annotated § 40-35-503(b)(2) to violate the Ex Post Facto Clause. 465 F.3d 280, 294 (6th Cir. 2006) (Rogers, J., dissenting). However, neither the majority nor the dissent address the impact of regulations imposing the same "seriousness of the crime" standard on decisions of the Tennessee Board of Pardons and Paroles. *See supra* note 4.

[4] The constitutional amendment granted "[t]he general assembly . . . the authority to enact substantive and procedural laws to define, implement, preserve and protect the rights guaranteed to victims by [the amendment]." Tenn. Const. art. I, § 35.

*Id.* § 40-38-302(2)(E), (4)(A)(iii). Consequently, since 1998, victims or their families, if the victim is deceased, have the right to attend and be heard at parole hearings.

York contends that the laws granting victims or families of victims input in the parole process constitute ex post facto violations. Although victims may have been able to attend parole hearings in 1977, York argues that the Board now has no choice but to consider victim impact statements and to hear from the victim or families of victims. From our review of York's prior appeals, it does not appear that the issue of victim input in the parole process was addressed, and even if so, the nature of the input would potentially be different in each parole hearing.

The Board argues that there is no retroactive application because the victims' rights statutes and the constitutional amendment "did not provide anything new to parole release hearings." The Board claims "[v]ictims had the right to attend and address parole hearings in 1977" and "in 1977 as in 2013, the Board considered the view of the community, victims, victims' families and other interested parties." To examine the Board's claim, we look to the history of the parole system.

In 1913, "[t]he parole system came into vogue in Tennessee as part of the indeterminate sentence law." *State ex rel. Neilson v. Harwood*, 194 S.W.2d 448, 449 (Tenn. 1946). Under the law, the Board of Paroles was severely limited in the testimony it could consider in connection with paroles. The Board of Paroles could not

> hear any argument, from any attorney or other person not connected with the penitentiary, in favor or against the parole or release of any prisoner; but it may institute inquiries by correspondence, by taking testimony, or otherwise, as the history, physical, or mental condition or character of such prisoner, and each member of said Board is hereby authorized to administer oaths to witnesses for every such purpose.

1913 Tenn. Pub. Acts 16-17 (ch. 8 § 3). In 1937, the Legislature repealed the restrictions on hearing argument from attorneys or other persons not connected with the penitentiary, *State ex rel. Neilson*, 194 S.W.2d at 451, and instead granted the Board of Paroles the "power to issue subpoenas [and] compel the attendance of witnesses . . . pertaining to the subject of its inquiry." 1937 Tenn. Pub. Acts 1092 (ch. 276 § 3).

By 1976, the regulations governing the Board of Pardons and Paroles welcomed testimony as well as written statements at parole hearings:

> The Board encourages offender's families, friends and concerned correctional staff members to be present at hearings. Legal counsel and all other interested parties can certainly assist the Board in assessing and determining pertinant

9

[sic] factors, although grant hearings are not adversary proceedings. The Board will also accept any written statements or recommendations for consideration.

Tenn. Comp. R. & Regs. 0420-1-1-.08(2)(e) (1976), *superseded by statute*, Pardons and Paroles Reform Act of 1979, 1979 Tenn. Pub. Acts 852, 868. The regulations also addressed the potential sources of information. Possible sources included "[o]bservations about the suitability of parole release for the subject from court officials, law enforcements and other interested community members." *Id.* 0420-1-1-.08(3)(a). Although victims and victims' families were not mentioned as possible information sources, the Board of Pardon and Paroles was also permitted to consider "[s]uch other relevant information concerning the subject as may be reasonably available." *Id.*

As part of an ex post facto inquiry, we must necessarily compare the new law with the old to determine whether the new law is "more onerous." *Dobbert v. Florida*, 432 U.S. 282, 294 (1977). Not all retroactive changes in parole provisions are ex post facto violations. *See, e.g., Garner*, 529 U.S. at 246-47 (increasing parole hearing intervals from three to eight years for inmates serving life sentences did not violate the Ex Post Facto Clause); *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 501-02 (1995) (decrease in the frequency of parole hearings for inmates convicted of more than one homicide under certain circumstances did not violate the Ex Post Facto Clause). The Ex Post Facto Clause "was intended to secure substantial personal rights against arbitrary and oppressive legislation . . . and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Beazell v. Ohio*, 269 U.S. 167, 171 (1925) (citations omitted). The question is whether the retroactive application creates a "sufficient risk of increasing the measure of punishment attached to the covered crimes." *Garner*, 529 U.S. at 250 (citation omitted).

Our comparison of the victims' rights provisions challenged by York to the regulations applicable in 1977 permitting the Board to consider testimony and written statements at parole hearings convinces us that the challenged provisions pose an insignificant risk of increased punishment. Here, the statute requiring the Board to "receive and consider victim impact statements" and the constitutional amendment guaranteeing victims or their families the right to attend and be heard at parole hearings are procedural. *See Dobbert*, 432 U.S. at 293 ("Even though it may work to the disadvantage of a defendant, a procedural change is not ex post facto."). The provisions have no impact on the standards for determining suitability for parole, whose application is a matter of discretion vested in the Board. *See Doyle*, 340 S.W.2d at 893. Although "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause," we agree with the United States Supreme Court,

> that where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of

10

discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions.

*Garner*, 529 U.S. at 253. In sum, the challenged victims' rights provisions do not alter a substantial right.

For the same reasons, the challenged victims' rights provisions do not violate the prohibition against ex post facto laws found in the Tennessee Constitution. We also note that "[t]he procedures the Board must follow (as opposed to the standards for granting parole) are not usually considered a part of law annexed to the crime." *Baldwin v. Tenn. Bd. of Paroles*, 125 S.W.3d 429, 432 (Tenn. Ct. App. 2003); *but cf. Weaver v. Graham*, 450 U.S. 24, 32 (1981) (It is unnecessary to determine whether sentence credits were "in some technical sense part of the sentence to conclude that it in fact is one determinant of petitioner's prison term—and that his effective sentence is altered once this determinant is changed.").

## B. Other Claims

Although we see the irony in the Board asking the trial court to consider matters outside of the record such as the affidavit of Mr. Traughber and then objecting to York's discovery requests, our resolution of the ex post facto claims renders these issues immaterial.

## III. CONCLUSION

For the reasons set forth above, we affirm the trial court's decision.

_____
W. NEAL MCBRAYER, JUDGE

11