RENDERED: AUGUST 25, 2016
TO BE PUBLISHED

# Supreme Court of Kentucky

2014-SC-000241-DG

FINAL

DATE 9/15/16 *Kim Redmon* DC

JONATHAN MCDANIEL                                                                 APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.            CASE NOS. 2012-CA-001172-MR; 2012-CA-001299-MR;
AND 2012-CA-001513-MR
CALLOWAY CIRCUIT COURT NO. 09-CR-00181


COMMONWEALTH OF KENTUCKY                                             APPELLEE


2014-SC-000242-DG


DAVID DESHIELDS                                                                   APPELLANT


ON REVIEW FROM COURT OF APPEALS
V.            CASE NOS. 2012-CA-001172-MR; 2012-CA-001299-MR;
AND 2012-CA-001513-MR
MCCRACKEN CIRCUIT COURT NO. 09-CR-00547


COMMONWEALTH OF KENTUCKY                                             APPELLEE


2014-SC-000243-DG


JOHN C. MARTIN                                                                   APPELLANT


ON REVIEW FROM COURT OF APPEALS
V.            CASE NOS. 2012-CA-001172-MR; 2012-CA-001299-MR;
AND 2012-CA-001513-MR
ANDERSON CIRCUIT COURT NO. 09-CR-00042


COMMONWEALTH OF KENTUCKY                                             APPELLEE

**OPINION OF THE COURT BY JUSTICE HUGHES**

<u>**AFFIRMING ON OTHER GROUNDS AND VACATING IN PART**</u>

Prior to an amendment in 2011, Kentucky Revised Statute (KRS) 532.043 provided in part that in addition to the other penalties authorized by law, any person convicted of certain offenses, including any felony offense under KRS Chapter 510, the Penal Code chapter addressed to sex offenses, "shall be subject to a period of conditional discharge" following the "expiration of sentence." KRS 532.043(1) (2006). In May and July of 2012, Jonathan McDaniel, David DeShields, and John Martin, all inmates at the State Reformatory in LaGrange, Kentucky, and all serving sentences for felony sex offenses, filed very similar *pro se* motions in their respective trial courts challenging the legality of the conditional discharge requirement and seeking to have the discharge period deleted from their sentences. All three trial courts denied the motion, and all three defendants appealed. In each case, the trial court, although having denied the defendant's request for Department of Public Advocacy (DPA) assistance in the trial court with the motion itself, granted his request for DPA assistance on appeal. The Court of Appeals consolidated the three cases; denied DPA's request to be allowed to withdraw; and ultimately, although for reasons having little to do with the issues raised in the trial courts, affirmed the trial court's ruling in each case. We granted the defendants' joint motion for discretionary review to address their concern that the Court of Appeals inappropriately characterized their trial court motions as having been brought pursuant to Kentucky Rule of Criminal Procedure (RCr) 11.42, and to address our own concern that the Court of Appeals, perhaps in

2

its eagerness to try to calm the waters after the 2011 amendment to KRS 532.043, inappropriately ruled on a question not properly before it. Our review strengthening rather than allaying these concerns, we affirm the Court of Appeals' ultimate affirmance of the trial court rulings denying relief, but "vacate" the Court of Appeals' opinion except as to the issue of whether Martin's and McDaniel's guilty pleas were subject to appellate review.

**RELEVANT FACTS**

Although the procedural history of this case, particularly the effect of appointed counsel's involvement once DPA was belatedly enlisted in the cause, is most germane to the issues before us, we necessarily begin with brief accounts of the three defendants' cases. In March 2010, Jonathan McDaniel pled guilty in the Calloway Circuit Court to one count of first-degree sex abuse, victim under twelve (KRS 510.110), a class C felony that McDaniel committed on or about May 19, 2009. In its May 2010 Final Judgment, after previously accepting McDaniel's plea bargain, the trial court sentenced McDaniel to six years' imprisonment, subject to the mandatory five-year conditional discharge period in KRS 532.043.

David DeShields pled guilty in the McCracken Circuit Court in September 2010 to two counts of first-degree sex abuse, victim under twelve, for crimes committed in June and October of 2009. The trial court's November 2010 Final Judgment reflected DeShields's plea bargain and sentenced DeShields to two six-year terms of imprisonment, the two terms to run concurrently. Among other consequences of a sex offense, such as treatment

3

and registration requirements, the Judgment also noted the five-year conditional discharge requirement.

In January 2011, John Martin pled guilty in the Anderson Circuit Court to six counts of first-degree sex abuse, to two counts of second-degree sodomy (KRS 510.080, a class C felony), and to one count each of second and third-degree rape (KRS 510.050, Class C felony, and 510.060, Class D felony). The crimes were committed against a single victim and spanned the years 2001 to 2007, with at least two of the crimes having been committed after July 2006, when the General Assembly increased the conditional discharge period from three years to five. The trial court's April 2011 Final Judgment incorporates Martin's plea bargain for concurrent sex-abuse and sodomy sentences together with consecutive rape sentences for a total sentence of twenty-three years' imprisonment. As do the others, Martin's Final Judgment also notes the five-year conditional discharge requirement.

As noted above, the defendants all were incarcerated at the LaGrange Reformatory, and the motions they each filed seeking to have the conditional discharge portion of their sentences removed are similar enough to suggest that they all worked from the same template or had the assistance of the same "legal aide." They challenged the conditional discharge requirement on a number of grounds (not all of which are stated with the utmost clarity), but principally (1) as a sentence "enhancement" imposed on the basis of judicial fact-finding in violation of *Apprendi v. New Jersey,* 530 U.S. 466 (2000), which generally requires the jury to find any fact that will allow an "enhanced" or

4

"aggravated" sentence;[1] (2) as a judicially imposed harsher sentence than the sentence bargained for with the Commonwealth, contrary to *Bailey v. Commonwealth,* 70 S.W.3d 414 (Ky. 2002) (construing KRS 532.070, which allows trial court amelioration of jury-imposed sentences the court believes too harsh);[2] and (3) as a "second" sentence for the given crime, in violation of the Double Jeopardy Clause of the United States Constitution, which clause generally forbids that crimes be punished more than once.[3]

---

[1] Here, of course, the defendants waived jury fact-finding by pleading guilty, and each of them, by pleading guilty to a felony offense within KRS Chapter 510, admitted the fact (no judicial fact-finding required) that subjected them to the conditional discharge "enhancement."

[2] In *Bailey* the Court reiterated that KRS 532.070 does not authorize a trial court to impose a sentence harsher than the one the jury imposed. As *Bailey* clarified, of course, KRS 532.070 does not apply to sentences arrived at via guilty plea. To the extent, however, that the defendants invoked *Bailey* to assert that trial courts also are not authorized to impose a harsher sentence than the one bargained for, *cf.* RCr 8.10, which disallows, in the guilty-plea context, a harsher than bargained for sentence unless the trial court gives the defendant notice of the harsher sentence and an opportunity to withdraw his plea. The gist of the defendants' argument, or at least a principal part of the argument, appears to be that conditional discharge was precisely a judicially added "harshener" to the plea bargain. That argument clearly does not apply to one of the cases, that of DeShields, for at DeShields's plea colloquy the trial court referred expressly to the conditional discharge requirement. During their colloquies conditional discharge was not mentioned expressly, but Martin and McDaniel both acknowledged having been advised by counsel of "all the penalties" made possible by their crimes, and neither of them objected at sentencing when the conditional discharge requirement was included as a part (a mandatory part) of their bargained-for sentences. Martin, to be sure, moved, in the days immediately prior to his sentencing, to withdraw his plea, and he complained that counsel had failed generally to explain the plea's consequences. But he did not mention conditional discharge (or any other specific consequence) in particular, and the trial court, on the basis of its review of the plea colloquy, concluded that Martin's plea had been voluntary and did not otherwise justify withdrawal. Martin did not challenge those rulings by way of appeal. *Cf. Commonwealth v. Tigue,* 459 S.W.3d 372 (Ky. 2015) (discussing pre-sentence motions to withdraw a guilty plea).

[3] Conditional discharge, of course, although an addition to the term-of-years sentence either bargained for (as in these cases) or imposed by the jury, is not a "second" punishment imposed in the course of a "second" jeopardy, as disallowed by

5

When their respective trial courts rejected these challenges and denied their motions to amend their sentences, the defendants filed notices of appeal, and each, as noted, was granted DPA assistance. DPA's motion in the Court of Appeals to be relieved of that responsibility can fairly be interpreted as DPA's assertion that the appeals, and the trial court motions underlying them, were meritless.[4] The Court of Appeals, however, hopeful that DPA briefing would shed light on an "issue of first impression" before the Court—"a legal challenge to the conditional discharge provision of KRS 532.043"—denied DPA's request to withdraw.[5] Order, No. 2012-CA-001172-MR (Oct. 24, 2012).

DPA then duly filed briefs on behalf of Martin, McDaniel, and DeShields, but (not surprisingly, perhaps, given DPA's apparent assessment of the defendants' trial court motions) the arguments DPA raised on appeal did not have much to do with the issues addressed by the trial courts. Instead, after DPA entered the case, Martin's and McDaniel's claims that their trial courts

---

the Double Jeopardy Clause, but is merely a portion of a single sentence imposed in the course of the original jeopardy.

[4] DPA brought its motion pursuant to KRS 31.110(2)(c), which provides that the right to counsel under KRS Chapter 31 does not extend to DPA representation in post-disposition proceedings unless the proceeding is one "that a reasonable person with adequate means would be willing to bring at his or her own expense." DPA's insistence that these appeals did not meet that standard, strongly suggests that in DPA's view the appeals were meritless.

[5] This case well illustrates the difficulties courts, trial and appellate, confront as they try to make the most of the limited supply of DPA representation. While we certainly agree with the Court of Appeals that DPA has a vital role to play in the articulation of novel criminal justice issues, it must be apparent that its ability to fill that role on appeal will be marginal, at best, where it has had no hand in shaping the trial court record, and where, by its own estimate, that record provides no opening by which the "novel" issue might legitimately be reached.

6

had sentenced them beyond their plea bargains morphed into claims that, because those two defendants were unaware when they entered their pleas of the conditional discharge portion of their sentences, their pleas were involuntary and thus invalid.

DPA's main argument, an argument it made on behalf of all three defendants, had even less to do with the defendants' original motions. An understanding of this argument requires a brief discussion of KRS 532.043 (2006), the conditional discharge statute. As noted already, that statute provided that persons convicted of certain specified offenses, including felony sex offenses, shall serve, in addition to their ordinary term-of-years sentences, an additional period of conditional discharge. When the statute first came into effect in 1998, the discharge period was three years. Effective as of July 2006, the General Assembly increased the discharge period to five years.

As originally conceived by the General Assembly, conditional discharge was a sort of probation/parole hybrid. Like parole, the defendant's discharge came after judicial proceedings had ceased and jurisdiction expired, and the conditions of discharge were specified by the Department of Corrections. KRS 532.043(3) (2006). As with probation, however, revocation proceedings were assigned to prosecutors and the courts. KRS 532.043(5) (2006).

In 2010, in *Jones v. Commonwealth,* 319 S.W.3d 295 (Ky. 2010), in response to a separation of powers issue raised by DPA, this Court held that that hybrid approach violated our Kentucky Constitution's strong separation of powers provisions by involving the courts—the judicial branch—in the

7

Department of Corrections'—the executive branch's—affairs. While "[t]he General Assembly can," we explained, "consistent with the separation of powers doctrine, create a form of conditional release with terms and supervision by the executive branch[,] . . . the statutory scheme runs afoul of the separation of powers doctrine when *revocation* is the responsibility of the judiciary." 319 S.W.3d at 299-300.

In response to *Jones,* in 2011 the General Assembly, as part of the massive House Bill 463, changed the name from "conditional discharge" to "postincarceration supervision," and amended subsection 5 of KRS 532.043 to provide for Parole Board, rather than judicial, oversight of revocations. By early 2012 the Department of Corrections had issued regulations governing postincarceration supervision revocation proceedings, including regulations— 501 Kentucky Administrative Regulations (KAR) 1:070—devoted to sex offender revocation proceedings.

In its briefs on behalf of Martin, McDaniel, and DeShields, DPA focused on this statutory shift from the judicial revocation procedures in effect at the time of the defendants' offenses, to the new Parole Board procedures that would likely be in effect when the defendants completed their periods of incarceration and became subject to postincarceration supervision. DPA argued that the new procedures accorded persons under supervision less protection against revocation (hence producing additional incarceration) than did the former procedures, such that application of the new procedures to the defendants would amount to a due process violation, the sort of "fair warning"

8

violation the United States Supreme Court addressed in *Bouie v. City of Columbia,* 378 U.S. 347 (1964). In that case a state supreme court's surprising reinterpretation of one of the state's criminal statutes was held to raise under the federal Constitution's Due Process Clause "fair warning" concerns analogous to those addressed by the Ex Post Facto Clause with respect to criminal-law changes brought about by new legislation.[6]

Simply put, the defendants' cases mutated in DPA's opening Court of Appeals briefs. They changed from the defendants' relatively straightforward illegal-sentence claims (claims DPA had already indicated it had no interest in pursuing), to, in Martin's and McDaniel's cases, challenges to their guilty pleas, and in all three cases to a "due process" claim that looked a lot like an *ex post facto* claim. And the mutating was not over.

The defendants' original motions to amend their sentences and the trial courts' orders denying those motions did not make reference to any particular rule or statute authorizing the motion, but in each of its briefs to the Court of Appeals, the Commonwealth asserted, parenthetically, that each defendant's

---

[6] Apparently DPA purports to justify raising on appeal this patently unpreserved claim by noting that the defendants' trial court motions, in conjunction with their reference to *Apprendi,* also refer to the federal Constitution's Due Process Clauses, as though that bald reference put the trial court on notice of every case everywhere in which "due process" has in any way been construed. Needless to say (we would hope), that notion does not comport with an adequate understanding of notice pleading and its requirements or of motion practice. *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) (discussing and applying *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), which adopted a "facial plausibility" standard for pleadings under Federal Rule of Civil Procedure 8(a)(2), the federal counterpart of our CR 8.01(1)). *And see* CR 7.02, which requires that motions for trial court orders "state with particularity the grounds therefor."

motion should be understood as having been brought pursuant to RCr 11.42, which authorizes persons under a criminal sentence to collaterally attack that sentence by filing an appropriate motion in the sentencing court. Because the defendants' motions had indeed sought to correct what the defendants maintained was an invalid portion of their sentences, the Commonwealth's seemingly offhand proposal to tidy up the record by expressly invoking RCr 11.42 may not at first glance have seemed controversial.

In fact, however, the proposal was not mere "housekeeping" of the record. In general, RCr 11.42 gives a person under sentence one, and only one, opportunity to "state all grounds for holding the sentence invalid." RCr 11.42(3). Generally, a second such motion is not allowed. *Gross v. Commonwealth*, 648 S.W.2d 853, 856 (Ky. 1983) (describing Kentucky's "organized and complete" set of procedures "for attacking the final judgment of a trial court in a criminal case"); *McQueen v. Commonwealth*, 949 S.W.2d 70 (Ky. 1997) (affirming the denial of a successive RCr 11.42 motion). Thus, characterizing the defendants' motions as RCr 11.42 motions would likely preclude the defendants from invoking RCr 11.42 "again" to attack their judgments on the ground, say, of ineffective assistance of counsel, which is perhaps the most common use of RCr 11.42.[7] Alert to that consequence of the Commonwealth's proposal, DPA devoted the entirety of its reply briefs in the

---

[7] Indeed, one of the defendants, Martin, not long after his motion "to amend sentence" was denied, filed an RCr 11.42 motion asserting, among other things, ineffective assistance of counsel.

10

appellate court to arguing that the defendants' motions would be more appropriately understood as brought pursuant to Rule of Civil Procedure (CR) 60.02, which also allows, in narrow circumstances, collateral relief from a criminal sentence. *Gross*, 648 S.W.2d at 856-57.

The cases before the Court of Appeals thus bore little resemblance to the cases decided by the trial courts. Whereas the trial courts had been asked to address *Apprendi*, *Bailey* (implicitly RCr 8.10), and double jeopardy, the Court of Appeals had before it whether, and if so how best, to characterize the defendants' motions; whether Martin and McDaniel pled guilty involuntarily; and whether the after-the-crime change from "conditional discharge" to "postincarceration supervision" and from judicial to Parole Board revocation procedures somehow encroached upon the defendants' right to due process. Clearly, apples and oranges.

Unfortunately for DPA, none of this recasting of the case accomplished anything. The Court of Appeals agreed with the Commonwealth that the defendants' motions could appropriately be deemed "11.42s"; it declined to address the validity of Martin's and McDaniel's guilty pleas, since neither defendant had challenged his plea in the trial court; and, although (somewhat inconsistently) it did address the equally unpreserved "due process"/"*ex post facto*" issue regarding revocations, it rejected DPA's contention that Parole Board revocation procedures so altered the "postincarceration" revocation landscape as to implicate the "fair warning" concerns that often accompany retrospective changes to the criminal law.

11

We granted the joint motion for discretionary review because we agree with the defendants that the Court of Appeals' RCr 11.42 characterization of their trial court motions raises significant fairness concerns similar to those the United States Supreme Court addressed in *Castro v. United States,* 540 U.S. 375 (2003). We are persuaded, furthermore, that, even aside from the lack of preservation, when the defendants presented their "due process"/"*ex post facto*" claims to the Court of Appeals they were not ripe and therefore were not reviewable. We must thus "vacate," as it were, almost all of the Court of Appeals opinion. Since those issues, however, have virtually no bearing on the trial court orders underlying these appeals, and since no one has suggested that those orders were erroneous, we affirm the Court of Appeals' bottom line, which was to affirm the trial courts' orders.

## ANALYSIS

### I. The Court Of Appeals Erred By Characterizing the Defendants' Unlabeled Motions as RCr 11.42 Motions.

As noted above, when the Court of Appeals characterized the defendants' "motions to amend" as having been brought pursuant to RCr 11.42, that characterization had consequences, or at least potential consequences, beyond merely establishing the standard of appellate review. Since for the most part a person under criminal sentence is limited to one RCr 11.42 motion, the effect of the Court of Appeals' characterization would be to preclude, or at least to limit severely, the defendants' subsequent resort to that Rule. In *Castro, supra,* the United States Supreme Court encountered a similar situation.

12

There, the appellant, Castro, a federal prisoner under sentence for a drug conviction, filed in 1994 in the federal district court a *pro se* motion for a new trial, a motion Castro styled as having been brought under Rule (Fed. R. Crim. Proc.) 33. In its response, the Government noted that the motion was more appropriately construed to invoke the federal habeas statute, 28 U.S.C. § 2255, and then a couple of times in the Opinion accompanying its denial of the motion, the district court referred to it as a "§ 2255" motion. Like our RCr 11.42, 28 U.S.C. 2255 allows persons under sentence to attack the sentence collaterally, but it strictly limits a person's "second or successive" use of its procedure. Still *pro se,* Castro appealed from the denial of his 1994 motion, but he did not challenge the district court's recharacterization of it.

Some three years later, in 1997, Castro, again *pro se,* filed what he called a "§ 2255" motion, wherein he alleged, among other things, that he had received ineffective assistance of counsel. After some back-and-forth between the district court and the Eleventh Circuit Court of Appeals, the district court ruled that the 1997 motion was Castro's second "§ 2255" motion—the 1994 motion being the first—and dismissed the 1997 motion for failing to meet one of the conditions (prior appellate court approval) for a "second or successive" motion under the habeas statute. The Eleventh Circuit affirmed the dismissal, but in doing so it urged district courts prior to recharacterizing prisoners' *pro se* pleadings to "'warn prisoners of the consequences of recharacterization and provide them with the opportunity to amend or dismiss their filings.'" *Castro,*

13

540 U.S. at 379 (quoting *Castro v. United States,* 290 F.3d 1270, 1274 (11th Cir. 2002)).

The United States Supreme Court granted Castro's petition for certiorari, and early in its analysis it noted the widespread recognition among the federal circuit courts that "by recharacterizing as a first § 2255 motion a *pro se* litigant's filing that did not previously bear that label, [a] court may make it significantly more difficult for that litigant to file another such motion." *Castro,* 540 U.S. at 382. In light of that risk (and in accord with what already was the practice in most of the federal circuits), the Court then, pursuant to its supervisory powers over the federal judiciary, held that before a district court may recharacterize a *pro se* litigant's motion as a first § 2255 motion, it

> must notify the *pro se* litigant that it intends to recharacterize the pleading, warn the litigant that this recharacterization means that any subsequent § 2255 motion will be subject to the restrictions on 'second or successive' motions, and provide the litigant an opportunity to withdraw the motion or to amend it so that it contains all the § 2255 claims he believes he has.

*Castro,* 540 U.S. at 383. Absent this admonition, "the motion cannot be considered to have become a § 2255 motion for purposes of applying to later motions the law's 'second or successive' restrictions." *Id.*

As we have noted, RCr 11.42, like the federal habeas statute,[8] contemplates for the most part that those invoking it will do so only once,

---

[8] Kentucky Rule of Criminal Procedure 11.42 was originally conceived as an analogue in our system to 28 U.S.C. § 2255, and while our Rule departed in its specifics from the federal law, its function remains similar. *Fraser v. Commonwealth,* 59 S.W.3d 448, 452 (Ky. 2001) (discussing the advent of our current Criminal Rules and in particular of RCr 11.42).

14

raising in a single motion all grounds for collateral relief from the challenged sentence that could then reasonably be presented. RCr 11.42(3). In furtherance of that purpose, our rule implicitly imposes similarly strict limits on subsequent motions, *Gross, supra,* and there is thus the risk that the characterization of a *pro se* litigant's pleading as an initial RCr 11.42 motion could "make it significantly more difficult for that litigant to file another such motion." *Castro,* 540 U.S. at 382.

We agree with the defendants, accordingly, and invoke our supervisory power to hold, that before a trial court characterizes a *pro se* litigant's unlabeled motion as an "11.42" or recharacterizes a motion the *pro se* litigant has labeled some other way as an "11.42," it must advise the litigant that it is doing so, must warn the litigant about the possible subsequent-motion consequences, and must give the litigant an opportunity to withdraw or to amend his or her motion. If *pro se* litigants are not so admonished, the subject motion cannot later be used against them as a bar to a "subsequent" motion under RCr 11.42. *Accord, People v. Shellstrom,* 833 N.E.2d 863 (Ill. 2005) (adopting a *Castro*-like admonition rule for *pro se* petitions deemed to come within the state's Post-Conviction Hearing Act); *Dorr v. Clarke,* 733 S.E.2d 235 (Va. 2012) (requiring a *Castro*-like admonishment before recharacterization of a *pro se* pleading as a petition pursuant to the state habeas corpus statute); *and see Barker v. Commonwealth,* 379 S.W.3d 116 (Ky. 2012) (discussing this Court's supervisory power over the judicial branch and applying that power to require that probationers be admonished, before testifying at a revocation

15

hearing, of the extent to which their testimony could be used against them at a subsequent criminal trial).

In these cases, of course, it was the Court of Appeals and not the trial courts that characterized the *pro se* motions as "11.42s," and so the rule we have just announced is implicated only indirectly. We understand the appellate panel's desire to be certain about what it was dealing with, since the character of a motion or pleading bears not only on standing prerequisites and the showing the movant must make to be entitled to relief, but also on an appellate court's standard of review. As the Supreme Court noted in *Castro,* there are thus good reasons in many instances for a *trial court* to characterize or to recharacterize a *pro se* motion or pleading. The court may want "to avoid an unnecessary dismissal, . . . to avoid inappropriately stringent application of formal labeling requirements, . . . or to create a better correspondence between the substance of a *pro se* motion's claim and its underlying legal basis." *Castro,* 540 U.S. at 381-82. RCr 11.42 itself, moreover, contemplates trial court characterization or recharacterization by indicating that application of the Rule hinges on the motion's substance, not the manner in which it is styled. RCr 11.42(4). The rule we announce today is in no way intended to discourage trial courts from characterizing *pro se* motions as "11.42s" when appropriate, it is only meant to ensure that the *pro se* litigant be made aware of the possible consequences and be given an opportunity in light thereof to reconsider.

On the other hand, neither is our ruling here intended to *require* trial courts to characterize *pro se* motions. Where, for example, as seems likely to have occurred in these cases, the trial court determines that regardless of how the motion is characterized it could not give rise to any sort of relief—the legal theory being patently off the mark—the court is not obliged to engage in (re)characterization. In that instance, however, unless the litigant himself has expressly invoked RCr 11.42, the motion will not count as an initial "11.42" so as to limit the litigant's subsequent resort to that rule.

Notwithstanding its good intentions, therefore, the Court of Appeals panel erred by characterizing as "11.42s" the motions the trial courts left ambiguous. At the appellate stage the defendants could not withdraw or recast their motions, and, for the reasons discussed above, without that opportunity we deem it unfair to saddle those defendants with the difficulty of showing the justification for a successive RCr 11.42 motion should they file one.

Aside from the possible "successive motion" consequence, however, which we hereby preclude,[9] the defendants have not suggested how they were prejudiced by the Court of Appeals' characterization of their motions. In our view, likewise, the appellate panel's error in characterizing the motion as "11.42s" was otherwise harmless.

---

[9] Because the defendants will not suffer any prejudice from the fact that their motions were not characterized in the trial court, we reject their suggestion that the remedy for the appellate panel's error should be a remand to the trial courts for characterization there.

17

Theoretically, we suppose, by construing the defendants' trial court motions as "11.42s," the Court of Appeals inappropriately limited the scope of its review and could be thought to have neglected the possibility that the motions might have fared better under the standards of some other rule, a possibility the trial courts implicitly considered and rejected. As noted above, however, DPA, on behalf of the defendants, made no attempt whatsoever before the Court of Appeals to argue that the trial courts erred in their assessments of the defendants' original motions. It argued instead that the defendants were entitled to relief on grounds never before raised or addressed. Similarly, before this Court the defendants have made no attempt to show that, had it not limited itself to RCr 11.42, the Court of Appeals might have assessed some part of their appeals differently. Aside from the "successive RCr 11.42 motion" concern addressed above, therefore, we are convinced that to the extent the Court of Appeals erred by characterizing the defendants' motions as "11.42s," the error was harmless and does not entitle the defendants to any additional relief.

## II. The Court Of Appeals Should Not Have Addressed the Merits of the Defendants' Unripe "Due Process"/"*Ex Post Facto*" Claim.

The defendants also maintain that the legislative and regulatory changes enacted during 2011 and 2012, whereby responsibility for revocations of postincarceration supervision was transferred from the courts to the Parole Board,[10] constitute, as applied to anyone whose offense predates the 2011

---

[10] *Cf.* KRS 532.043(5) (2006): "If a person violates a provision specified in subsection (3) of this section, the violation shall be reported in writing to the

18

amendment of KRS 532.043(5), a violation of both the Kentucky and the federal constitutional guarantees against *ex post facto* laws.[11 & 12] As the defendants correctly note, those provisions forbid, among other things, "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. *Peugh v. United States*, ___ U.S. ___, 133 S. Ct. 2072, 2078 (2013) (quoting *Calder v. Bull*, 3 Dall. 386, 390, 1 L. Ed. 648 (1798)).

With respect to this "greater punishment" sort of *ex post facto* claim, the "touchstone" of the inquiry, the Supreme Court has explained, "is whether a given change in law presents a 'sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Peugh*, 133 S. Ct. at 2082

---

Commonwealth's attorney in the county of conviction. The Commonwealth's attorney may petition the court to revoke the defendant's conditional discharge and reincarcerate the defendant as set forth in KRS 532.060." and KRS 532.043(5) (2011): "If a person violates a provision specified in subsection (3) of this section, the violation shall be reported in writing **by the Division of Probation and Parole. Notice of the violation shall be sent to the Parole Board to determine whether probable cause exists** to revoke the defendant's **postincarceration supervision** and reincarcerate the defendant as set forth in KRS 532.060." (Emphasis supplied to indicate amendment.).

[11] Section 19(1) of the Kentucky Constitution provides that "[n]o ex post facto law, nor any law impairing the obligation of contracts, shall be enacted." Article 1, § 10 of the Constitution of the United States provides that "[n]o State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts."

[12] As noted above, before the Court of Appeals the defendants argued that the new revocation procedures violated their right under the Due Process Clause of the federal Constitution to "fair notice" of the consequences of their crimes, an argument, as discussed by the Commonwealth in its Court of Appeals response, more at home, in this case at least, under the Ex Post Facto Clause. Before us, the defendants, as is their wont, have shifted ground somewhat and have made the *ex post facto* claim express by citing *ex-post-facto* cases and by insisting that "the lack of due process afforded to defendants facing post-incarceration supervision revocation is so great, it amounts to an ex post facto violation." It is the *ex post facto* claim, therefore, that we discuss. We note, however, that any vestigial claim remaining under the Due Process Clause would share the *ex post facto* claim's lack of ripeness.

19

(quoting *Garner v. Jones,* 529 U.S. 244, 250 (2000), which in turn quotes *California Dept. of Corrections v. Morales,* 514 U.S. 499, 509 (1995)). "Not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited." *Garner,* 529 U.S. at 250 (citation omitted). Whether a change in law creates a sufficient risk of increased punishment, rather, "is 'a matter of degree[,]'" the Court has noted, and the test "cannot be reduced to a 'single formula.'" *Peugh,* 133 S. Ct. at 2082.

In *Garner,* the Court acknowledged that "[r]etroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept [the precept against retroactively increasing punishment]." 529 U.S. at 250. But in the parole context, too, the controlling inquiry is "whether retroactive application of the change in . . . law created 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" Id. (quoting *Morales,* 514 U.S. at 509).

The defendants contend that the change in law whereby the Parole Board, rather than the courts, oversees revocations from postincarceration supervision creates a sufficiently serious risk of increased punishment— increased incarceration as a result of more readily imposed revocation—to render the 2011 amendment to KRS 532.043(5) an *ex post facto* law with respect to persons whose crimes predate the amendment. They base this contention on a comparison, in some detail, of the revocation procedures recently promulgated by the Parole Board with those formerly provided by the courts. This comparison shows, they maintain, that the Parole Board

20

procedures provide less protection against revocation than did the judicial ones.

The Court of Appeals rejected this argument outright (or at least the beta version of it with which it was confronted). In the panel's view, "the new procedures actually afford offenders more due process than did the previous proceedings." *Martin v. Commonwealth,* No. 2012-CA-001172-MR, p. 6 (April 4, 2014).

We decline to enter this debate, because we are convinced that it was premature. The Supreme Court has made clear that the federal Ex Post Facto Clause[13] does not provide a platform for the launching of speculative or abstract complaints about changes to the criminal law, but requires that the complainant be affected by the change in some real and concrete way. *Dobbert v. Florida,* 432 U.S. 282, 300-01 (1977) (refusing to consider a claim that parole ineligibility provisions added to a statute authorizing a life sentence amounted in that case to an *ex post facto* violation, because the claimant did not receive a life sentence); *Morales,* 514 U.S. at 509 (reversing grant of habeas corpus, because statutory change allowing deferrals of parole reconsideration "create[d] only the most speculative and attenuated possibility of producing the prohibited effect[,] [*i.e,* increased punishment]. . . and such conjectural effects are insufficient" to establish a violation of the Ex Post Facto Clause); *Weaver v. Graham,* 450 U.S. 24, 29 (1981) (noting that "two critical elements must be

---

[13] There is no claim here that Section 19 of the Kentucky Constitution calls for a different interpretation.

21

present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and *it must disadvantage the offender affected by it.*") (footnotes and citations omitted, emphasis added); *cf. Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (explaining that the "irreducible constitutional minimum of standing" includes, among other elements, the requirement that "the plaintiff must have suffered an 'injury in fact' . . . which is (a) concrete and particularized, . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical.') (citations and internal quotation marks omitted).

At the time they brought their "due process"/"*ex post facto*" contentions to the Court of Appeals, all of the defendants were still serving their sentences and so had not even graduated to postincarceration supervision, much less been confronted by a Parole Board revocation proceeding. None of them, in other words, had yet been affected, and certainly not disadvantaged or injured, in any concrete way by the amendment to KRS 532.043(5). There was every possibility that the defendants would emerge from their terms of postincarceration supervision without encountering the new revocation process. Their concerns at the time they raised them were thus purely conjectural. The Court of Appeals should not have addressed them.

Their claims, moreover, based solely on a facial analysis of the numerous provisions of the new Parole Board regulations, also raise the sort of ripeness concerns we discussed recently in *W.B. v. Commonwealth,* 388 S.W.3d 108 (Ky. 2012), another case in which the plaintiff challenged the constitutionality of a

22

complex administrative investigative procedure—the Department of Community Based Services' process for investigating (and substantiating or not) allegations of child abuse. Although in *W.B.* the agency had initiated the administrative process, and thus confronted the plaintiff with a real enough risk of injury, we nevertheless denied the plaintiff's request for a sort of preemptive constitutional review ahead of the administrative action.

We did so, we explained, lest the lack of a concrete record involve us in factual speculation and require us to address the statute more generally than would be necessary were the case allowed to play out. "Passing upon the possible significance of the manifold provisions of a broad statute[,]'" we noted, "'in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case.'" 388 S.W.3d at 113 (quoting *Communist Party of the United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 71 (1961)). Without "an actual administrative proceeding to review," we worried, our consideration of the case "would in large part be confined to engaging in an academic and abstract view of the Cabinet's regulatory scheme. The basic rationale of the ripeness requirement is 'to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]'" 388 S.W.3d at 314 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). But abstract disagreement about the merits of judicial vis-à-

vis Parole Board revocation procedures and academic commentary on the Parole Board's regulatory scheme are the essence of the defendants' claims.

Again, we decline the invitation to join that debate. We impose no undue hardship by insisting that the defendants' claims must wait until they have become concrete and immediate enough to implicate real *ex post facto* concerns.

## CONCLUSION

In sum, although we affirm the bottom line at which the Court of Appeals arrived in these cases—*i.e.,* affirmance of the trial court orders denying the defendants' motions to amend their sentences, we "vacate," in effect, two aspects of the Court of Appeals' Opinion.

We do not approve, first, the Court of Appeals' characterization of the defendants' unlabeled trial court motions as RCr 11.42 motions. Trial courts may characterize or recharacterize a *pro se* litigant's pleading as an initial "11.42," to spare the litigant, for example, from the summary consequences of an inappropriate label, or simply to clarify for all concerned the procedural context and lay of the land. Before the trial court does so, however, it must advise the litigant of its intention, warn the litigant that the characterization will likely make it harder for the litigant to bring a subsequent motion under that Rule, and allow the litigant an opportunity to withdraw the pleading or to supplement it. Because generally an appellate court will not be in a position to offer the litigant this opportunity to reconsider, it will generally be inappropriate, and was inappropriate in this case, for the appellate court to

24

(re)characterize as an RCr 11.42 motion a *pro se* pleading. The defendants' "motions to amend" in these cases should not, therefore, be used against them as any sort of bar to their subsequent resort to RCr 11.42.

Also inappropriate, we are convinced, was the Court of Appeals' decision to address the merits of the defendants' unpreserved and unripe "due process"/"*ex post facto*" challenge to the amended version of KRS 532.043(5). The defendants will have ample opportunity to raise that challenge if the Parole Board ever invokes its new revocation procedures against them.

With these caveats, we hereby affirm the decision of the Court of Appeals to the extent it affirms the trial courts' orders denying defendants' motions.

All sitting. All concur.

COUNSEL FOR APPELLANTS
JONATHAN MCDANIEL AND
DAVID DESHIELDS:

Meredith Krause
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLANT
JOHN C. MARTIN:

Margaret Anne Ivie
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEES:

Andy Beshear, Attorney General of Kentucky

Thomas Allen Van De Rostyne
Christian Kenneth Ray Miller
Assistant Attorney General
Office of the Attorney General

25